# BURT *v.* UNION CENTRAL LIFE INSURANCE COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 70. Argued November 6, 1902.—Decided December 22, 1902.

As public policy forbids the insertion in a contract of a condition which would tend to induce crime, it also forbids the enforcement of a contract under circumstances which cannot be lawfully stipulated for.

Where a man, who has commited murder, thereafter assigns a policy of insurance on his own life payable to his estate and is subsequently convicted and executed for the crime, the beneficiaries cannot recover on the policy. The crime of the assured is not one of the risks covered by a policy of insurance, and there is an implied obligation on his part to do nothing to wrongfully accelerate the maturity of the policy.

It is the policy of every State to uphold the dignity and integrity of its courts of justice and as contracts insuring against miscarriage of justice would encourage litigation and bring reproach upon the State, its judiciary and executive, they would be against public policy and void; and therefore an action cannot be maintained by the beneficiaries of an insurance policy on the life of a man executed for murder on the ground that his conviction and execution were unjust.

THIS was an action, to recover on a policy of life insurance, commenced in the District Court of Travis County, Texas, and removed to the Circuit Court of the United States for the Western District of Texas. The policy was issued August 1, 1894. William E. Burt was the insured. The policy, in case of death, was payable to Anna M. Burt, the wife of the insured, if living, otherwise to his executors, administrators or assigns. On September 10, 1895, the beneficiary Anna M. Burt and her husband, the insured, assigned a one half interest to plaintiffs to secure them as creditors of the assignors. On July 24, 1896, the beneficiary, Anna M. Burt, died intestate, as did also the only children of the beneficiary and the insured. On February 4, 1897, the insured, William E. Burt, conveyed to the plaintiffs the remaining interest in the policy, making them the sole owners of it. They are also his sole heirs, and as such are

entitled to the full benefit of the policy, there being no administration on his estate nor any necessity for one.

On November 27, 1896, the insured, having been indicted for the murder of his wife, Anna M. Burt, the beneficiary, was tried and convicted in the District Court of Travis County, Texas, a court of competent jurisdiction, was sentenced to be put to death, and on May 27, 1898, was hanged pursuant to such sentence. The petition in this case alleged that, notwithstanding such conviction, sentence and execution, the insured, William E. Burt, did not in fact commit the crime of murder, nor participate therein, but that if he did the policy was not avoided thereby, because he was at the time insane.

The policy, which in its general scope was an ordinary policy of life insurance, contained these provisions :

"Third. If the insured should, without the written consent of the company, at any time enter the military or naval service, the militia excepted, or become employed in a liquor saloon, or if the insured should die by self-destruction, whether sane or insane, within three years from date hereof, this policy shall be null and void.

\* \* \* \* \* \* \* \*

"The contract of insurance between the parties hereto is completely set forth in this policy and the application for the same."

A demurrer to the petition was sustained and judgment entered for the defendant, which was thereafter affirmed by the Court of Appeals of the Fifth Circuit, 105 Fed. Rep. 419, and thereupon the case was brought here on certiorari. 181 U. S. 617.

*Mr. Gardner Ruggles* for petitioners.

*Mr. Robert Ramsey* for respondent.

Mr. Justice Brewer, after making the foregoing statement, delivered the opinion of the court.

There is nothing in the policy which in terms covers the contingency here presented, the extracts therefrom given in the

preceding statement being all that even remotely by suggestion or inference can have any bearing. The question therefore is whether an ordinary life policy, containing no applicable special provisions, is a binding contract to insure against a legal execution for crime. The petitioners would distinguish between cases in which the insured is justly convicted and executed and those in which he is unjustly convicted. The allegation here is that, notwithstanding his conviction and execution, he was not in fact guilty, that he did not participate in the killing of his wife, and that if he did he was insane at the time, and therefore not responsible for his actions.

Accepting the division made by counsel as one facilitating a just conclusion concerning the rights of the parties hereto, we inquire, first, whether a policy of life insurance is a contract, binding the insurer to pay to the beneficiary the amount of the policy in case the insured is legally and justly executed for crime. In other words, do insurance policies insure against crime? Is that a risk which enters into and becomes a part of the contract?

The researches of counsel have found but one case directly in point, *The Amicable Society* v. *Bolland*, decided by the House of Lords in 1830, and reported in 4 Bligh N. S. 194, 211. The Lord Chancellor, delivering the opinion, after stating the question, answered it in the following brief but cogent words:

"It appears to me that this resolves itself into a very plain and simple consideration. Suppose that in the policy itself this risk had been insured against: that is, that the party insuring had agreed to pay a sum of money year by year, upon condition, that in the event of his committing a capital felony, and being tried, convicted, and executed for that felony, his assignees shall receive a certain sum of money—is it possible that such a contract could be sustained? Is it not void upon the plainest principles of public policy? Would not such a contract (if available) take away one of those restraints operating on the minds of men against the commission of crimes—namely, the interest we have in the welfare and prosperity of our connexions? Now, if a policy of that description, with such a form of condition inserted in it in express terms, cannot, on grounds

of public policy, be sustained, how is it to be contended that in a policy expressed in such terms as the present, and after the events which have happened, that we can sustain such a claim? Can we, in considering this policy, give to it the effect of that insertion, which if expressed in terms would have rendered the policy, as far as that condition went at least, altogether void?"

There are some differences between that case and the present in the surrounding facts, but none that are material. There the policy was taken out for the benefit of the insured's estate. Here the beneficiary was the wife of the insured, or, if she should not be living at the time of his death, his estate. As her death preceded his, the conditions of the insurance became practically the same. In that case the insured had assigned all his interest in the policies upon certain trusts, though the plaintiffs were his assignees in bankruptcy. Here he and his wife, the original beneficiary, transferred a half interest to these plaintiffs, who were their creditors, but the amount of the indebtedness is not shown, and the policy provided "should this policy be assigned or held as security, a duplicate of said assignment must be filed with the company, and due proofs of interest produced with proofs of death. This company does not guarantee the validity of any assignment;" a requirement which does not appear to have been complied with. So that the rights of the plaintiffs depend mainly if not wholly upon the fact of the assignment made by the insured after the killing of his wife and prior to his execution, and the further fact that they are his sole heirs. The plaintiffs therefore in each of the cases claimed directly under the insured and sought to recover on a policy obtained by him, the maturity of which was accelerated by his execution for crime. In neither policy was there any express stipulation in respect to such a contingency, so that the reasoning of the Lord Chancellor is pertinent to this case, and it is reasoning the force of which it is impossible to avoid. It cannot be that one of the risks covered by a contract of insurance is the crime of the insured. There is an implied obligation on his part to do nothing to wrongfully accelerate the maturity of the policy. Public policy forbids the insertion in a contract of a condition which would tend to

induce crime, and as it forbids the introduction of such a stipulation it also forbids the enforcement of a contract under circumstances which cannot be lawfully stipulated for.

That case was cited with approval in *Ritter* v. *Mutual Life Insurance Company*, 169 U. S. 139, in which we held that a life insurance policy taken out by the insured for the benefit of his estate was avoided when he in sound mind intentionally took his own life—and this irrespective of the question whether there was a stipulation in the policy to that effect or not. In the opinion other cases were cited bearing more or less directly on the general question. Among them was *New York Mutual Life Insurance Company* v. *Armstrong*, 117 U. S. 591, 600, an action by the assignee of a life insurance policy, and the defence that the assignee murdered the insured in order to get the benefit of the policy, in respect to which Mr. Justice Field, speaking for the court, said :

"It would be a reproach to the jurisprudence of the country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had wilfully fired."

Also *Hatch* v. *Mutual Life Insurance Company*, 120 Massachusetts, 550, 552, an action on a policy of insurance on the life of a married woman whose death was caused by a miscarriage produced by illegal operation performed upon and voluntarily submitted to by her with an intent to cause an abortion, and without any justifiable medical reason for such an operation, from the opinion in which these words were quoted :

"We can have no question that a contract to insure a woman against the risk of her dying under or in consequence of an illegal operation for abortion would be contrary to public policy, and could not be enforced in the courts of this Commonwealth."

Also *Supreme Commandery &c.* v. *Ainsworth*, 71 Alabama, 436, 446, a case of the suicide of the insured, in which is this language :

"Death, the risk of life insurance, the event upon which the insurance money is payable, is certain of occurrence ; the uncertainty of the time of its occurrence is the material element and

consideration of the contract. It cannot be in the contemplation of the parties, that the assured, by his own criminal act, shall deprive the contract of its material element; shall vary and enlarge the risk, and hasten the day of payment of the insurance money. . . . The fair and just interpretation of a contract of life insurance, made with the assured, is, that the risk is of death proceeding from other causes than the voluntary act of the assured, producing or intended to produce it; . . . The extinction of life by disease, or by accident, not suicide, voluntary and intentional, by the assured, while in his senses, is the risk intended ; and it is not intended that, without the hazard of loss, the assured may safely commit crime."

But the stress of the plaintiffs' contention rests on the allegation that the insured was unjustly convicted and executed; that he did not in fact commit the crime of murder or participate therein, and that if he did it was while he was insane and not responsible for his actions. It is urged that according to the authorities heretofore cited the risk which is not insured against is death as a punishment for crime ; that if there be no crime, no wrong done by the insured, the mere fact of his death as the outcome of proceedings in a court of justice does not vitiate the contract of insurance unless there is some express stipulation therefor. It is said that the adjudication in the criminal case is not as to these plaintiffs conclusive of the insured's guilt; that they may show in this independent action facts which would satisfy a jury that the outcome of those legal proceedings was unjust because the insured did not participate in the crime, or if he did that he was legally irresponsible therefor by reason of insanity. It is not doubted that the criminal prosecution was an adjudication of the insured's guilt, his sanity and legal responsibility for the crime, but the principle of *res judicata* is that a judgment is conclusive only as between the parties and their privies, and these plaintiffs say they were not parties to the criminal action and are not privies to either party thereto.

If the case turned on the applicability of the principle of *res judicata* there would be little difficulty in reaching a conclusion. There is no identity of parties, nor are the two parties to

this action privies to those in the criminal proceeding. A judgment in a criminal prosecution for assault and battery cannot be invoked as *res judicata* in a civil action by the party injured to recover damages. But there the two actions run along parallel lines, and the relief sought in each is the direct and natural result of the wrong complained of. Here, the civil action is founded upon the result of the other—cannot be maintained but for the fact of that result. If the insured had been acquitted there would have been no cause of action on the policy, while the fact that the defendant in the illustration given was acquitted of the criminal offence would not bar the civil action to recover damages. *Cottingham* v. *Weeks*, 54 Georgia, 275.

This action can be maintained only on the assumption that there was a failure of justice in the criminal case. It implies a miscarriage of justice. But can there be a contract of insurance against the miscarriage of justice? In the opinion of the Court of Appeals the question is thus stated and answered:

"Can there be a legal life insurance against the miscarriage of justice? Can contracts be based on the probability of judicial murder? If one policy so written be valid, the business of insuring against the fatal mistakes of juries and courts would be legitimate. The same principle could be applied, in a kind of accident insurance, to the miscarriage of justice in cases that led to convictions and punishments not capital. And in each suit to enforce such a policy the issue as to the fatal judicial mistake would be tried by another jury and court, not infallible.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"It is the policy of every State or organized society to uphold the dignity and integrity of its courts of justice. Such contracts would be speculations upon whether the courts would do justice. They would tend to encourage a want of confidence in the efficiency of the courts. They would tend to stir up litigation—litigation that would reopen tried issues. They would impress the public with the belief that the results of trials of the gravest kind were so uncertain that the innocent could not escape condemnation by a jury and unjust judgment by the court, or obtain pardon of the executive. Such contracts would encourage litigation and bring reproach upon the

State, its judiciary and executive, and would, we think, be against public policy and void. The policy of the law often permits and even requires, for error, a new trial of a convicted defendant, but never after his execution."

The views thus expressed commend themselves to our judgment. There is a wagering feature in such a stipulation which forbids its being incorporated into a policy of insurance, and if it cannot be formally incorporated into the contract its omission therefrom does not by implication give it life and validity.

See to what any other conclusion would lead: Suppose beneficiaries at the time of the trial of an insured for murder were possessors, and the sole possessors, of a knowledge of facts that would establish his innocence. As good citizens it would be their duty to furnish that evidence and thus prevent a miscarriage of justice. As beneficiaries it would be their interest to withhold their evidence and thus let an innocent man be punished. Can a contract be upheld which is not only a wager upon the result of criminal proceedings but also tends to place before individuals an inducement to assist in bringing about such miscarriage of justice?

In *Evans* v. *Jones*, 5 Mees. & W. 77, an action was brought on a wager as to the conviction or acquittal of a prisoner on trial on a criminal charge, and it was held that the action could not be sustained. Lord Abinger observed: "No man has a right to acquire by his own act an interest in interfering with the proceedings of courts of justice, more especially of criminal justice, in which a man is bound honestly to declare all he knows relative to the case in the course of adjudication. Here the party had acquired by the wager a direct interest in procuring the conviction of the prisoner; and although it is impossible to say in what precise manner an improper bias may be exerted, or whether it will have any effect or not, yet the very tendency of his mind to act in such a way as to pervert the course of justice, is a sufficient foundation for the illegality of such wagers." (p. 81.) Baron Parke concurred in these words: "I entirely agree. No case has been cited at variance with the principle laid down by the Lord Chief Baron. It appears to me that it is a reasonable objection to the legality of a

wager, that it has a tendency to influence and pervert the course of criminal justice. There ought to be a disposition in every person to come forward and give any evidence which he may be in possession of, tending to insure either the acquittal or conviction of a person lying under a criminal charge; but the necessary tendency of a wager of this description is to induce the party to it either to give false testimony, if it be his interest to procure a conviction, or, if the other way, to withdraw from the court evidence which he may either possess at the time of laying the wager, or which may afterwards come to his knowledge. And even if a party be not in a situation to suppress or fabricate evidence, still he may influence the result of the trial by prejudicing the public mind on the case, and thus deprive the party charged of the fair trial to which he is entitled." (p. 82.)

It may be said the plaintiffs have made no contract in which any element of wager exists. The contract was between the insured and the company, and in that there was no other element of wager than is found in any ordinary insurance policy. This may be technically true. The plaintiffs made no contract, but they are seeking to enforce one containing, so far as they are concerned, all the elements which, as indicated in the quotations just made, forbid its enforcement on the ground of public policy. They claim in part, under an assignment made before the homicide, the value of which, however, they do not disclose, and they were the heirs of the insured, and after the death of his wife and children, would, in the absence of any will, become the beneficiaries in full. So they stood prior to the trial, with a personal interest drawing them in one direction and a public duty which might possibly compel active efforts in a contrary direction. That these plaintiffs may have known nothing in respect to the circumstances of the homicide, or been unable to furnish any evidence *pro* or *con* on the matter of insanity, is immaterial. It is enough that the contract has such a tendency, and it is not essential that, in fact, it produced a conflict in the minds of these plaintiffs or changed their conduct.

The judgment of the Court of Appeals is

*Affirmed.*