# RUDOLPH *v.* UNITED STATES EX REL. STUART.

POLICE PENSIONS; STATUTES; DEATH; SUICIDE; PRESUMPTION; LIFE IN-
SURANCE.

1. The police pension system of the District of Columbia was inaugurated
   by the act of Congress of February 25, 1885 (23 Stat. at L. 316,
   chap. 145). The subsequent acts (February 28, 1901, 31 Stat. at L.
   820, chap. 623; March 1, 1905, 33 Stat. at L. 821, chap. 1299, and
   others) relating to the same subject-matter did not operate to repeal
   the original act of 1885.

2. When words are used in an indefinite sense in a later statute, which
   can be given a definite meaning from the language of a former stat-
   ute, and both acts relate to the same subject of legislation, the one
   should not be held to repeal the other, but they should be so con-
   strued together as to furnish, if possible, a reasonable interpreta-
   tion of the legislative will.

3. The act of Congress of March 1, 1905 (33 Stat. at L. 821, chap. 1299),
   relating to pensions, and which provides that "in case of the death
   from injury or disease of any member of the police or fire depart-
   ment, if he be unmarried, and leave a dependent mother, who is a
   widow, the same shall be for her relief during the period of widow-
   hood," etc., refers only to death or injury occurring or disease con-
   tracted in the manner defined in the act of February 25, 1885 (23
   Stat. at L. 316, chap. 145), creating the pension system; namely,
   "in the line of duty."

4. While the statute creating a police pension system for this District
   does not constitute a contract, it partakes of the nature of a con-
   tract, to the extent that it confers a bounty or gratuity in the form
   of a pension as an inducement for entering the service and remain-
   ing therein for a given period of time. Such a statute differs from a
   contract in that the government may withdraw the benefits con-
   ferred at any time it may deem advisable, after a party enters the
   service, either before or after the right to a pension accrues.   (Cit-
   ing *Macfarland* v. *Bieber*, 32 App. D. C. 513.)

5. While there is no vested right in a pension, which cannot be devested
   by the mere exercise of the legislative will, if the beneficiaries thereof
   have any rights, they are vested ones so long only as the statute
   creating the pension remains in force and unchanged, subject to be

devested at any time that the legislature may desire. While such a statute, therefore, is in full force, and the right of the beneficiary under it has accrued and is permitted to exist, the rules for the interpretation of contracts may be applied in determining the rights of the parties.

6. The meaning of the term "suicide" at the common law is one who, being of years of discretion, and sound mind, destroys himself. The act consists in designedly destroying one's life.

7. The presumption is that one who commits suicide is sane, so that an admission by demurrer that a person committed suicide is an admission that he was sane when he killed himself.

8. There is no difference in law between a contract of insurance which expressly provides against recovery in case of suicide and one where such a provision is implied. The prohibition is in the contract in both instances. The one forbids recovery as effectually as the other, and in neither case can the contract be enforced.

9. The police pension system of the District of Columbia does not contemplate the granting of a pension in case of suicide.

No. 2249.   Submitted January 3, 1911.   Decided February 6, 1911.

HEARING on an appeal by the respondents from a judgment of the Supreme Court of the District of Columbia, sustaining a demurrer to an answer to a petition for the writ of mandamus.

*Reversed.*

The COURT in the opinion stated the facts as follows:

This action was brought by relators, Helen Stuart and her daughter, Helen Gertrude Stuart, an infant child under sixteen years of age, for a writ of mandamus against the commissioners of the District of Columbia, to require the allowance of a pension of $50 per month for the relator Helen Stuart, and $25 per month for the relator Helen Gertrude Stuart, on account of the death of the husband of said Helen Stuart while a private on the police force of this District.

The petition shows that Walter J. Stuart had been a member of the Metropolitan Police Department for a period of over five years prior to the date of his death on June 28, 1910. The respondents in their answer allege that Stuart neither resigned

nor was dismissed from the police force; and that, according to a report made concerning his death, it was disclosed that he had committed suicide on June 28, 1910. This report was referred to the pension board for investigation. After hearing testimony relating to his death, the board found, among other things, that, "in view of the fact that the late Private Walter J. Stuart did not die of injuries received or disease contracted in the line of duty, we recommend that no allowance from the police fund be made in this case." This finding was subsequently approved by the board of commissioners. Relators interposed a demurrer to the answer, which was sustained. Respondents refusing to further plead, a peremptory writ of mandamus was issued. From this order the case comes here on appeal.

*Mr. Edward H. Thomas,* Corporation Counsel, for the appellants.

*Mr. Henry B. F. Macfarland* (*Mr. Charles Cowles Tucker* and *Mr. J. Miller Kenyon* being with him on the brief) for the appellees.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

The police pension system in this District was inaugurated by the act of February 25, 1885 (23 Stat. at L. 316, chap. 145). It created a police fund to "be used for the relief of any policeman who, by injury received or disease contracted in the line of duty, or having served not less than fifteen years, shall become so permanently disabled as to be discharged from service therefor; and in case of his death from such injury or disease, leaving a widow or children under sixteen years, for their relief." The relief provided by this act, "shall not exceed, for any one policeman or his family, the sum of fifty dollars per month."

The amount of the pension was increased by sec. 4 of the act of February 28, 1901 (31 Stat. at L. 820, chap. 623), with express reference to the act of 1885, as follows: "The super-

intendent, assistant superintendent, any captain or lieutenant of police, in a case of retirement, as now provided by law, shall receive relief not exceeding one hundred dollars per month; and in case of the death from injury or disease of any of the officers named in this section, if he leave a widow or children under sixteen years of age, the same shall be for their relief during the period of widowhood, or until such children reach the age of sixteen years: Provided, That in no case shall the amount paid to a widow exceed fifty dollars per month, nor shall the amount paid for a child exceed twenty-five dollars per month."

The act of 1901 was amended by the act of March 1, 1905 (33 Stat. at L. 821, chap. 1299), to read as follows: "The superintendent, assistant superintendent, any captain or lieutenant of police, in case of retirement, as now provided by law, shall receive relief not exceeding one hundred dollars per month; and in case of the death from injury or disease of any member of the police or fire department, if he be unmarried and leave a dependent mother, who is a widow, the same shall be for her relief during the period of widowhood; or if he leave a widow, or children under sixteen years of age, the same shall be for their relief during the period of widowhood, or until such children reach the age of sixteen years: Provided, That in no case shall the amount paid to such dependent mother, or widow exceed fifty dollars per month, nor shall the amount paid for a child exceed twenty-five dollars per month."

It is insisted by counsel for relators that, by the terms of the later statute, Congress provided for the giving of a pension regardless of whether death was due to injury received or disease contracted in the line of duty. Counsel insist that the words "in case of the death from injury or disease of any member of the police or fire department," as found in the act of 1905, have no relation to the original act of 1885, providing that the injuries shall be received or disease contracted in the line of duty.

The various acts cited, together with others not material to this inquiry, constitute the pension relief system of the District of Columbia for policemen. They all have their origin in

and relate back to the act of 1885. The narrow line of construction insisted upon is not consistent, in our opinion, with any reasonable view of the law of this case.

One thing can be clearly demonstrated: that the subsequent acts do not operate as a repeal of the original act of 1885. We must go back to that act to find the essentials of the pension system. The original act provided relief for a member of the police force and his family. The relief was given to the member, first, in case he received injury or contracted disease while in the line of his duty; and second, if he served not less than fifteen years, and became so "permanently disabled as to be discharged from service therefor." The relief provided for the family was based solely upon the death of the member "from such injury or disease." The subsequent acts relating to the retirement of a member all relate back to the original act for the conditions upon which a member is entitled to retire with a pension. So, also, we are relegated to the original act for a legislative definition of the words "in case of the death from injury or disease." In the original act alone has Congress declared when these words are applicable to a condition which entitles the widow and children of a deceased member of the police department to a pension. When words are used in an indefinite sense in a later statute, which can be given a definite meaning from the language of a former statute, and both acts relate to the same subject of legislation, the one should not be held to repeal the other, but they should be so construed together as to furnish, if possible, a reasonable interpretation of the legislative will.

The rule of construction is clearly stated in Potter's Dwarris on Statutes, 189, as follows: "As one part of a statute is properly called in, to help the construction of another part, and is fitly so expounded as to support and give effect, if possible, to the whole, so is the comparison of one law with other laws made by the same legislature, or upon the same subject, or relating expressly to the same point, enjoined for the same reason, and attended with a like advantage. In applying the maxims of interpretation, the object is, throughout, first, to ascer-

tain by legitimate means, and next, to carry into effect, the intentions of the framer. It is to be inferred that a code of statutes, relating to one subject, was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions. It is therefore an established rule of law that all acts *in pari materia* are to be taken together, as. if they were one law; and they are directed to be compared in the construction of statutes, because they are considered as framed upon one system, and having one object in view." The same rule is given in Endlich on the Interpretation of Statutes, sec. 183.

Construing, therefore, the words "death from injury or disease," in the act of 1905, to refer to death from injury occurring or disease contracted in the manner defined in the original act, it is unnecessary to inquire into the scope of the words "in the line of duty," since there is no theory upon which the judgment of the court below can be sustained. Even accepting relators' construction of the law, their case would not be improved. It is conceded by the demurrer that the decedent committed suicide. It is true that the answer of respondents does not allege that he was sane when he committed the act; but that, we think, is not necessary. Such a requirement would imply that the burden rested upon the respondents to establish that the decedent was sane when he took his own life. This is not the law.

This case is closely analogous to one where the insured destroys his own life in order that his legal representatives or the beneficiaries designated in the policy may get the insurance. While the statute in this instance does not rise to the dignity of a contract, it partakes of the nature of a contract to the extent that it confers a bounty or gratuity in the form of a pension as an inducement for entering the service, and remaining therein for a given period of time. The statute differs from a contract in that the government may withdraw the benefits conferred at any time it may deem advisable, after a party enters the service, either before or after the right to a pension accrues. *Macfarland* v. *Bieber*, 32 App. D. C. 513. It also fol-

lows that, while there is no vested right in a pension which cannot be devested by the mere exercise of the legislative will, if relators have any rights, they are vested ones so long only as the statute in question remains in force and unchanged, subject to be devested at any time that Congress may desire. While the statute, therefore, is in full force, and the right of a beneficiary under it has accrued and is permitted to exist, the rules for the interpretation of contracts may be applied in determining the rights of the parties.

We are now confronted squarely by the proposition whether or not relators acquired any right in the pension by virtue of the death of the decedent. We think, under the issues here presented, they did not. It may be that if the decedent was insane when he took his life, and the insanity was contracted while in the line of his duty as a policeman, relators would have a right to recover. That question, however, is not before us. There is no allegation of insanity in the petition. The burden of establishing that fact is upon the relators. The presumption is that a person who commits suicide is sane. *Ritter* v. *Mutual L. Ins. Co.* 169 U. S. 139, 42 L. ed. 693, 18 Sup. Ct. Rep. 300; *Hopkins* v. *Northwestern Life Assur. Co.* 94 Fed. 729; *Plunkett* v. *Supreme Conclave, I. O. H.* 105 Va. 643, 55 S. E. 9. In *Shipman* v. *Protected Home Circle,* 174 N. Y. 398, 63 L.R.A. 347, 67 N. E. 83, the court said: "Thus, the unqualified finding of the learned trial court that plaintiff's husband committed suicide is in effect a determination that it was the intentional act of a sane man. Aside from this, however, there is the presumption of sanity which must be entertained in the absence of proof. Insanity cannot be predicated simply upon the act of self-destruction, for human experience has shown that sane men have taken their own lives."

The demurrer to the answer admits that the decedent committed suicide, the meaning of which at common law is that one who, being of years of discretion and sound mind, destroys himself. The act consists in designedly destroying one's life. To constitute suicide, the act must be committed by a person of years of discretion and of sound mind. Insanity must be

proven to remove the presumption that the act was intentionally done.   Suicide was a common-law crime, punishable by the forfeiture of the estate of the decedent.   To support relators' contention, therefore, would be equivalent to holding that, if the decedent had been killed while in the perpetration of a crime, or executed for a crime, during the term of his employment on the police force, relators would be entitled to the pension.   Such a construction is impossible.   *Burt* v. *Union Cent. L. Ins. Co.* 187 U. S. 362, 47 L. ed. 216, 23 Sup. Ct. Rep. 139.   In fact, counsel for relators, in their reply brief, make the broad claim that the "law entitles the appellees to pensions because of the death of Policeman Stuart, whether that death was due to suicide, sane or insane, or not."   Such an intention in framing the law cannot be imputed to Congress, unless it is so clearly disclosed by the act as to admit of no other reasonable interpretation.   It could only be supported upon the hypothesis that Congress intended that the bounty of the government should be extended to the family of a policeman irrespective of the circumstances occasioning his death.   We think the acts, construed together, support the opposite conclusion.

But it is contended by counsel for relators that, inasmuch as the statute specifically names the widow and children as the beneficiaries, and does not expressly provide against recovery by them in case of suicide by the husband, the right to the pension attaches, even though the husband, while sane, took his own life.   This contention is predicated upon the holding of certain State courts in the case of contracts for life insurance. Assuming that the statute in question does place relators in the same position as designated beneficiaries in a policy of life insurance which contains no provision against suicide, the position of the relators is not improved.

In the case of *Ritter* v. *Mutual L. Ins. Co.* 169 U. S. 139, 42 L. ed. 693, 18 Sup. Ct. Rep. 300, a life insurance policy was silent on the question of liability in case of suicide.   The assured committed suicide, and his legal representatives sought to enforce the policy.   It was held that there is an implied agreement on the part of the person insured not to intention-

ally kill himself for the purpose of enabling the beneficiaries to enforce liability under the policy. The court, speaking through Mr. Justice Harlan, said: "There is another consideration supporting the contention that death intentionally caused by the act of the assured when in sound mind—the policy being silent as to suicide—is not to be deemed to have been within the contemplation of the parties; that is, that a different view would attribute to them the purpose to make a contract that could not be enforced without injury to the public. A contract the tendency of which is to endanger the public interests or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice, or be made the foundation of its judgment. If, therefore, a policy taken out by the person whose life is insured, and in which the sum named is made payable to himself, his executors, administrators, or assigns, expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him or to whom he was indebted." After reviewing a large number of authorities, both English and American, to the effect that the enforcement of a policy of insurance under such conditions was not only against public policy, but that the contract contained an implied condition against liability in case of suicide, the opinion concludes: "For the reasons we have stated, it must be held that the death of the assured, William M. Runk, if directly and intentionally caused by himself, when in sound mind, was not a risk intended to be covered, or which could legally have been covered, by the policies in suit."

In *Hopkins* v. *Northwestern Life Assur. Co.* 94 Fed. 729, it was held that where there is no averment or proof that the insured was insane, the presumption of sanity must prevail. The court, in referring to *Ritter* v. *Mutual L. Ins. Co., supra,* said: "We do not think the question is open for discussion in the Federal courts. * * * Without quoting from the opin-

ion, it is enough to say breifly that the decision is put upon the
ground that, although the policy contained no condition against
suicide, nevertheless such a condition is an implied term of the
contract; and therefore, if the insured does commit suicide,
there can be no recovery. It is true that in *Ritter's Case* the
policy was made payable to the assured himself, or to his exec-
utors or administrators, while in the case before us the policy
was made payable to the wife of the assured; but, in our opin-
ion, this difference is not important. * · * * It seems to
follow that the quality and extent of the beneficiary's interest
in the contract is of no importance. * * * The fact that
the beneficiary is some other person than the insured himself
cannot enlarge the scope of the contract."

In *Burt* v. *Union Cent. L. Ins. Co.* 187 U. S. 362, 47 L. ed.
216, 23 Sup. Ct. Rep. 139, where the husband insured his life
for the benefit of his wife, and subsequently murdered her, and,
after conviction, and while under sentence to be executed, as-
signed the policy to his legal heirs, who, after the execution of
the assured, undertook to enforce the policy, the court, speaking
through Mr. Justice Brewer, said: "So that the rights of the
plaintiffs depend mainly, if not wholly, upon the fact of the
assignment made by the insured after the killing of his wife,
and prior to his execution, and the further fact that they are his
sole heirs. The plaintiffs, therefore, in each of the cases,
claimed directly under the insured, and sought to recover on
a policy obtained by him, the maturity of which was accelerated
by his execution for crime. In neither policy was there any
express stipulation in respect to such a contingency, so that the
reasoning of the Lord Chancellor [*Amicable Soc.* v. *Bolland,*
4 Bligh, N. R. 194, 2 Dow & C. 1] is pertinent to this case,
and it is reasoning the force of which it is impossible to avoid.
It cannot be that one of the risks covered by a contract of in-
surance is the crime of the insured. There is an implied ob-
ligation on his part to do nothing to wrongfully accelerate the
maturity of the policy. Public policy forbids the insertion in
a contract of a condition which would tend to induce crime, and
as it forbids the introduction of such a stipulation, it also for-

bids the enforcement of a contract under circumstances which cannot be lawfully stipulated for."

With this wholesome rule of interpretation for our guide, the question of designated beneficiaries vanishes. There is no difference in law between a contract of insurance which expressly provides against recovery in case of suicide, and one where such a provision is implied. The prohibition is in the contract in both instances. The one forbids recovery as effectually as the other, and in neither case can the contract be enforced. If such a provision is implied in an insurance contract, there is no logical reason against a similar construction being applied to the statute in question. Both stand upon the broad ground of public policy.

Applying, therefore, the rule of insurance to the case at bar, it must be held that Congress, in providing for policemen and those dependent upon them, did not intend thereby to invite the commission of crime, or to place a premium upon crime. Certainly, in the absence of any provision in the statute expressly granting a pension in case of suicide, the court will not supply it by implication. In the absence of express words to that effect, we will not imply that Congress intended by this act to violate the principles of public policy. If we were to accept the contention of counsel for relators that the right must be determined solely upon the act of 1905, there can be no recovery in the state of this record. In any view of the case it must appear that Stuart was insane when he took his life, and, as we construe the law, the disease must have been contracted when engaged in the line of duty as a policeman. No attempt has been made by relators to discharge this burden.

The judgment is reversed, with costs, and the cause is remanded for further proceedings not inconsistent with this opinion.                                    *Reversed.*