Louis Corey v. Massachusetts Mutual Life Insurance Company

(No. 8032)

Submitted January 15, 1935. Decided February 12, 1935.

*Price, Smith & Spilman* and *J. M. Woods,* for plaintiff in error.

*Copenhaver & Boiarsky,* for defendant in error.

Kenna, Judge:

Massachusetts Mutual Life Insurance Company prosecutes this writ of error to a judgment rendered against it in the circuit court of Kanawha County on June 20, 1934, in favor

of Louis Corey in a proceeding by notice of motion brought on a policy of life insurance issued by the plaintiff in error upon the life of Joe Corey in which the plaintiff, Louis Corey, was the named beneficiary. The judgment was entered after the defendant's demurrer to the amended notice of motion had been overruled, the defendant declaring its desire not to plead further and relying upon its demurrer to defeat the plaintiff's recovery on a pure question of law. The notice of motion, as amended, contains averments showing that the insured, Joe Corey, was indicted in the Intermediate Court of Kanawha County for the murder of one Katherine Ghiz; that he pleaded not guilty to the indictment, and, upon his trial, was convicted by a jury of murder in the first degree with no accompanying finding fixing punishment at life imprisonment; that he was thereupon sentenced to be hanged, and, pursuant to that sentence, was hanged in the state penitentiary at Moundsville, on the 8th day of December, 1933. It was upon this averment that the defendant rested its demurrer, and the case is here upon the question whether death of the insured by execution, as a matter of law based on public policy, prevents recovery under the life insurance policy sued on.

The coverage is a simple promise to pay the amount of the policy upon receiving satisfactory proof of the death of the insured. There is no stated exception of death by execution. Suicide within a year is not covered and if the insured engages in military or naval service in time of war within a year from the policy's date without paying an extra premium stipulated for in such event, the policy becomes void. The policy is made incontestable after the lapse of one year except for the non-payment of premiums and for violation of its provisions relating to military and naval service in time of war. The policy is in the amount of two thousand dollars and is dated September 25, 1918.

The defendant in error, plaintiff below, urges that the incontestable clause of the policy operates to prevent plaintiff in error from setting up the defense sought to be made. Plaintiff in error counters this contention by saying that public policy prevents the contract from covering death by execu-

tion, whether the express terms of the policy include it or not, and, therefore, that the incontestable clause does not meet the defense, since that clause cannot operate to enlarge the coverage. Without discussing whether public policy would affect the actual terms of a contract, or would merely operate to render objectionable terms unenforceable, we cannot help but believe that a public policy that would prevent recovery in such a case, would also operate upon the incontestable clause to prevent it from making the recovery possible. If the incontestable clause could make recovery possible under these conditions after a policy life of one year, why not in six months? If in six months, why not in six days, or why not permit the company simply to stipulate that it will not contest liability under the policy on the ground of public policy at any time or in any event, and thus render the courts powerless to enforce the public policy of the state in so far as life insurance contracts are concerned? This seems to us to meet this contention.

It is urged that recovery could not be permitted under a life insurance policy where death has resulted by execution for murder because of the fact that there is an implied covenant on the part of the insured that he will do nothing wrongfully to accelerate the day of payment under the policy. It is difficult to believe that murder to be followed by public execution would be adopted by an insured as a means of accelerating the day of payment under his policy, and it might be questioned whether, if the day of payment is not *purposely* accelerated by the insured, the policy could be avoided on that basis, even without the incontestable clause. However, although we have just declared that we do not see how the matter of public policy could yield to the incontestable clause of an insurance policy, that is not to say that the incontestable clause, which is an *express* covenant of the policy, could not be successfully invoked to overcome the contended provisions of an *implied* covenant of the policy. We therefore are of the opinion that liability under the policy cannot be defeated on the basis of such an implied covenant. In view of the incontestable clause, which is in full operation under the terms of the policy before us, we think it unneces-

sary to decide in this case whether such an implied covenant will be read into a policy of life insurance.

The case must turn squarely on the point of whether there exists in this state a public policy that will prevent recovery under a life insurance contract not expressly excepting death by execution for crime, when the insured dies from that cause. We are, of course, not dealing with a case in which there is proof that at the time of entering into the contract the insured entertained a purpose to accelerate the payment of the amount of the insurance.

Cases in this country that hold that recovery upon a life insurance policy may be defeated by showing that the insured met death by execution at the hands of the law are the following: *Burt* v. *Union Central Life Insurance Co.*, 187 U. S. 362, 23 S. Ct. 139, 47 L. Ed. 216 (1902); *Collins* v. *Metropolitan Life Insurance Co.*, 27 Penn. Sup. 353 (1905); *Northwestern Life Insurance Co.* v. *McCue*, 223 U. S. 234, 32 S. Ct. 220, 56 L. Ed. 419 (1912); *Scarborough* v. *American, etc., Co.*, 171 N. C. 353, 88 S. E. 482 (1916); *American National Insurance Co.* v. *Munson*, (Tex.) 202 S. W. 987 (1918); *Weil* v. *Travelers Insurance Co.*, 16 Ala. App. 641, 80 So. 348 (1918); *American N. I. Co.* v. *Coates*, 112 Tex. 267, 246 S. W. 356 (1923); *Smith* v. *Metropolitan Life Insurance Co.*, 203 N. Y. Supp. 173 (1923); and *Smith* v. *Metropolitan Life Insurance Co.*, 211 N. Y. Supp. 755 (1925). Those cases holding to the contrary and concluding that recovery can be had under a life insurance policy containing no provision excepting death by execution from the risks assumed, in the event that the insured meets his death by execution, are the following: *Collins* v. *Metropolitan Life Insurance Co.*, 232 Ill. 37, 83 N. E. 542 (1907); *Armster* v. *Metropolitan Life Insurance Co.*, 207 Ill. App. 514 (1917); *Fields* v. *Metropolitan Life Insurance Co.*, 147 Tenn. 464, 249 S. W. 798, 36 A. L. R. 1250 (1923); *Weeks* v. *New York Life Insurance Co.*, 128 S. C. 223, 122 S. E. 586 (1924); *Allen* v. *Diamond*, 13 Fed. (2d) 579 (1926); *Afro-American, etc., Co.* v. *Jones*, 113 Fla. 158, 151 So. 405 (1933).

The first case to deal with the question presented was decided in the English House of Lords in the year 1830, being

that of *Amicable Society* v. *Boland,* 4 Bligh M. R. 194, some-
times called Fauntleroy's case. It is mainly in defense of, and
in attack upon, the reasoning of that case that the conflict in
American authority has developed. Apparently the question
did not arise in the United States until 1900, when the case
of *Burt* v. *Union Central Insurance Co.,* 105 Fed. 419, was
decided in the United States Circuit Court for the Fifth
Circuit. This case went to the United States Supreme Court
in 1902, and is reported in 187 U. S. 362, 23 S. Ct. 139, 47
L. Ed. 216. In the opinion, written by Mr. Justice Brewer,
the reasoning of the English case was adopted in toto, and
the opinion of Lord Campbell was quoted verbatim and almost
in full. Both cases denied recovery on the ground of public
policy.

The reasoning of the English case has often been vigorously
attacked in cases by the courts of last resort and by the law
writers. The following quotation from *Weeks* v. *New York
Life Insurance Company,* 128 S. C. 223, 122 S. E. 586, at page
588, is an example:

> "The position embraced within the first two postu-
> lates, viz., that because an express contract to insure
> against death by legal execution would contravene
> public policy, an ordinary life policy which does not
> except death from such a cause should be declared
> unenforceable on grounds of public policy, is, we
> think, clearly untenable. An express agreement that,
> in the event of death by legal execution, the insurer
> would pay a stipulated sum to the criminal's estate
> or beneficiaries, might be considered to evidence a
> design on the part of the insured, participated in by
> the insurer, to free the insured from such inhibition
> on *is* will to commit crime as might otherwise exist,
> and, where death by legal execution has ensued war-
> rant the inference that the crime was to an extent,
> superinduced by the contract. But where one takes
> out an ordinary life insurance policy, to be matured
> by death from any cause, no basis in reason or expe-
> rience exists for assuming that the insured had any
> intent at the time of making the contract to acceler-
> ate the maturity of the policy by committing a capi-
> tal crime and suffering the death penalty. So
> negligible is the possibility of any such design or

intent on the part of an insured that insurance companies, as in the contracts here in question, now incorporate no express condition, as was formerly quite generally done, against death for crime. As has been well said, 'the history of insurance makes difficult the argument that the exception is not now expressed because necessarily implied.' Collins, J., in *Campbell* v. *Supreme Conclave, etc.*, 66 N. J. Law, 274, 49 Atl. 550, 54 L. R. A. 576. The effect of the raising of the question in *Amicable Society* v. *Bolland, supra,* notwithstanding the decision favorably to the insurer, was, as pointed out in the Campbell Case, 'to lead to the general introduction into policies of an express exception.' In the absence, therefore, of an express agreement to insure against death for crime, certainly it would seem no intent or design to accelerate the maturity of the ordinary life insurance policy by committing a capital crime and inviting legal execution therefor is to be attributed to the insured at the time of the making of the contract. On the other hand, in the absence of an express stipulation in the policy excepting death by legal execution, no intent in fact to exclude death from that cause may fairly be claimed by the insurance company. Where such a contract has thus been entered into, the real question, therefore, is Does sound public policy require that the courts write into the policy the condition that death by legal execution is excepted?''

The following language quoted from the *Burt* case (187 U. S. 362, 365) shows that the basis of decision therein was left rather obscure:

''There is an implied obligation on his part to do nothing to wrongfully accelerate the maturity of the policy. Public policy forbids the insertion in a contract of a condition which would tend to induce crime, and as it forbids the introduction of such a stipulation it also forbids the enforcement of a contract under circumstances which cannot be lawfully stipulated for.''

This language makes it doubtful whether the case is intended to turn upon, first, an implied condition not to wrongfully accelerate the risk, or, second, the exclusion of the risk from

the policy on the ground of public policy, or, third, forbidding the enforcement of the policy, supposing that it does cover the risk. It is impossible to say that all are included in the basis of decision, since each contains elements contradictory of the others.

It seems to us, however, that one of the outstanding difficulties in following either the *Fauntleroy* case or the *Burt* case, is in adopting the assumption that to permit a recovery on a life insurance policy after death by execution at the hands of the law would tend to induce crime. We do not believe that this result would follow. It is to be observed that under the doctrine of these cases it is not the crime of murder that prevents the recovery, but that it is the punishment that sometimes follows that crime that does so. In this state, a man might be convicted of murder in the first degree and, if the jury further found that he be punished by life imprisonment, he would not be executed. His life insurance would remain enforceable. He might be convicted of murder in the first degree, sentenced to be hanged and, if he died a natural death before his hanging, his life insurance would remain enforceable. He might be convicted of murder in the first degree, sentenced to be hanged, and afterward pardoned. His life insurance would remain enforceable. A man might commit an openly heinous murder and, unless he were caught, convicted and executed, his life insurance would remain in effect and be paid at his death. So that it is seen that it is not the crime itself, but only the punishment by execution that prevents the recovery under the rule invoked. If this be true, might it not be argued that, since execution at the hands of the law would prevent the collection of life insurance intended to save wholly innocent persons from becoming public charges, juries would by such a policy be deterred from returning verdicts under which execution would result? Might it not also be argued that upon application for executive clemency after a death sentence, the fact that provision for a family would be wiped out by the execution of that sentence might be strongly persuasive upon the executive authority? In other words, might it not just as plausibly be urged that public policy dictates that the insurance should

be collectible, as that it dictates the contrary? Public policy would certainly abhor the idea of any person receiving substantial financial benefit from the fact of a legal execution. And yet this would be the inescapable result of holding that execution renders a policy of life insurance unenforceable. To point out that the beneficiary profits from the fact of execution does not answer this suggestion, because the contract is for the very purpose of conferring a benefit upon the beneficiary upon the insured's death, an inevitable occurrence in any event.

It would seem that the broad, basic and fundamental public policy of the state is to see that obligations undertaken are fulfilled, and that contracts entered into are performed. For reasons that are apparent, this policy may be declared with special emphasis with reference to contracts of life insurance. That this has been the decided trend of this Court's utterances on the subject is illustrated by the cases of *Johnson* v. *Insurance Company*, 85 W. Va. 70, 100 S. E. 865; and *State* v. *Phoenix Mutual Life Ins. Co.*, 114 W. Va. 109, 170 S. E. 909, 91 A. L. R. 1482. (It is true that in the case last named it was stated that where insured forfeits his life by law, possibly recovery on his life insurance policy would be denied and the *Scarborough* case from North Carolina was cited as an example of that view. This, however, is a mere precautionary allusion, indicative of the length to which other decisions have gone and not intended to bind this Court in the least.) To sustain such a public policy is one of the ends for the maintenance of courts and for rendering readily available the redress of legal grievances. He who asserts the unenforceability of an express contract on the ground of public policy is, in effect, asserting an exception to this basic public policy. The question here involved arose in England for the first time in 1830. The first decision on the question in the United States was in the *Burt* case in 1900. It arose in Virginia for the first time in the *McCue* case, decided by the United States Supreme Court in 1912. In more than seventy years, it has now arisen for the first time in West Virginia. The fact that circumstances giving rise to the principle sought to be established as a

matter of public policy have so rarely arisen, at least minimizes the importance of the question, if it does not affect its validity.

But we cannot escape the conclusion that there is a very definite public policy established in West Virginia by our legislative enactments, our judicial decisions and our constitutional provisions. That public policy is to do away with the consequences of crime except in so far as the direct punishment to the guilty person is concerned. There is no longer corruption of blood nor forfeiture of estate as a consequence of felony. Our statutes of descent and distribution make no exception against persons convicted of felony. The doctrine of so-called "civil death" as a consequence of felony no longer obtains in this state. A felon who has served his sentence may recover for a personal injury suffered during the time he was serving the sentence. *Moss* v. *Hyer,* 114 W. Va. 584, 172 S. E. 795. A felon may hold public office after his sentence has been served. *Webb* v. *County Court,* 113 W. Va. 474, 168 S. E. 760. Under the same conditions, he is not thereby disqualified as a voter. *Osborne* v. *County Court,* 68 W. Va. 189, 69 S. E. 470. A felon, even upon conviction of perjury, is no longer disqualified as a witness. So that to hold that the consequence of execution at the hands of the law is to prevent recovery upon insurance policies of the persons executed, causing innocent beneficiaries to suffer when the guilty one has gone beyond the reach of all earthly penalties, would not conform to the public policy of this state.

It is urged that, regardless of public policy, the very nature of the life insurance policy contract itself prevents death by execution from being one of the risks contracted to be assumed by the life insurance company. To say that the nature of an express contract must govern its terms, and then to read the agreement to see what sort of a contract it is before reaching a conclusion on the principle suggested, would be a difficult exercise. The terms of a contract must determine its nature: we cannot see how the nature of a contract could fix its terms. But passing what seems to be an inherent contradiction in the proposition advanced, its adoption would mean that the courts would have to write the contract, for,

if the principle could be applied to one clause, obviously it could be applied to all or any.

For the reasons herein stated, the judgment of the circuit court of Kanawha County is affirmed.

*Affirmed.*