## SANDERS v. METROPOLITAN LIFE INS. CO.

No. 6459.   Decided June 1, 1943.   (138 P. 2d 239.)

See 5 C. J. S., Appeal and Error, sec. 1803; 29 Am. Jur., 692, 706.

*Van Cott, Riter & Farnsworth,* of Salt Lake City, (*Harry Cole Bates,* of New York City, of counsel), for appellant.

*Moyle & Moyle,* of Salt Lake City, for respondent.

MOFFAT, Justice.

Defendant Insurance Company appeals from a judgment rendered against it for $224 and interest under the accidental

death benefit provision of a life insurance policy issued to plaintiff on the life of her son, Gordon Sanders, aged seven at the time the policy was taken out, and just over age fifteen at the time of his death on August 4, 1938. The Insurance Company paid the sum of $224 to plaintiff after receipt of proof of the death of her son, as the amount due under the policy schedules for his death, but refused to pay the double indemnity for the death alleged by plaintiff to have been caused, directly and independently of all other causes, solely through external, violent and accidental means.

Plaintiff commenced this action in the City Court of Salt Lake City, recovering judgment therein for the amount claimed. Defendant appealed and the case was tried de novo to a jury in the District Court of Salt Lake County, resulting in a verdict and judgment in favor of plaintiff for the amount of the accidental death benefit above stated, from which the appeal to this court is taken.

The pertinent clause of the insurance policy, together with the stated exceptions, is here quoted at length:

"Accidental Death Benefit. Upon receipt of due proof that the Insured, after attaining age 15 and prior to attaining age 70, has sustained, after the date of this Policy, *bodily injuries, solely through external, violent and accidental means, resulting, directly and independently of all other causes, in the death of the Insured within ninety days from the date of such bodily injuries while this Policy is in force, and* while premiums are not in default beyond the grace period specified in this Policy, *the Company will pay* in addition to any other sums due under this Policy and subject to the provisions of this Policy *an Accidental Death Benefit equal to the face amount of insurance then payable at death,* except that if such bodily injuries are sustained by the Insured while employed in or on the premises of any open pit or underground mine, or are sustained by the Insured while on or about the premises or right of way of any railroad company while the Insured is following the occupation of gang, track, or roadway laborer, track walker, yard, train or mixed train brakeman or flagman, then the Accidental Death Benefit shall be only one-half of the face amount of insurance then payable at death. In any case, the amount of the Accidental Death Benefit shall be reduced by the amount of any Disability Benefit which has become payable under this Policy on account of the same injuries as resulted in death.

"No Accidental Death Benefit will be paid if the death of the Insured is the result of self-destruction, whether sane or insane, nor if death is caused or contributed to, directly or indirectly, or wholly or partially, by disease, or by bodily or mental infirmity, nor if death results from bodily injuries sustained while participating in aviation or aeronautics, or while the Insured is in military or naval service in time of war."

At the opening of the trial, the following facts were stated to the court and jury as having been stipulated and agreed to between the parties: (1) The incorporation under the laws of New York of defendent and its qualification to do life insurance business in the State of Utah; (2) that plaintiff is a resident of Salt Lake County, State of Utah; (3) that under date of September 29, 1930, the plaintiff applied for and secured from the defendant a life insurance policy upon the life of her minor son Gordon Sanders, then seven years of age. Said policy of insurance is referred to and incorporated in the stipulation and shall be considered by the court and jury with the same force and effect as though introduced and received in evidence without objection by either of the parties hereto. (4) That as provided in said policy the Plaintiff paid insurance premiums of ten cents per week for each and every week after the said 29th day of September, 1930, up until the time of the death of the insured as hereinafter set forth. (5) That on the third day of August, 1938, near Salina, Utah, an automobile in which said Gordon Sanders was riding overturned and the same Gordon Sanders received bodily injuries therefrom which resulted in his death upon the fourth day of August, 1938. (6) That at the time of the death of the said Gordon Sanders said above-mentioned policy of insurance was in full force and effect. Said Gordon Sanders was born on the 11th day of July, 1923, and at the time of his death was fifteen years of age. (7) That under date of August 8, 1938, the plaintiff furnished to defendant due proof of the death of said Gordon Sanders and made demand upon the defendant company for the payment of the amount stipulated in the sched-

ule of said policy, together with the accidental death benefit agreed to be paid by the defendant. That the defendant paid the face amount of said policy, to wit, the sum of $224; but wholly refused to pay the double indemnity or accidental death benefit provided in said policy. (8) Said insured, Gordon Sanders, was lawfully adjudged a delinquent child by a court of competent jurisdiction and was by said court sentenced to confinement in the Utah State Industrial School, an institution maintained by the State of Utah for the confinement of delinquent minors. That on the second day of August, 1938, and before the expiration of his sentence aforesaid the insured, without committing force or violence, escaped from said institution and immediately following such escape he, with a companion named Raymond Burnett, age 14, took an automobile belonging to a Mrs. Bell of Ogden, without her knowledge or consent. That said insured and his said companion then drove said automobile to the town of Spring City in Sanpete County, Utah. At that place they broke the show window on the front of the store building of the Osborne Mercantile Company at Spring City and reached in and took two pairs of white shoes. That they then drove away from Spring City toward Manti, with the Burnett boy driving the car; that the two pairs of white shoes were in the same automobile when it was searched by the sheriff of Sanpete County after the accident. (It was further stipulated that any objection that might be raised to plaintiff not being the proper party to whom payment should be made under the policy was waived by defendant.)

Plaintiff was then called and testified that she is the mother of Gordon Sanders, deceased, the insured named in the policy; she identified her signature on the application for the insurance, dated September 19, 1930; and testified that she personally paid the premiums required under the policy from the time of its issue to the date of her son's death, (August 4, 1938). The application was then offered and received in evidence without objection to show that the insurance was applied for by plaintiff in her name and the

insured had nothing to do with its acquisition. Plantiff testified further that insured was born July 11, 1923, and that he had arrived at age fifteen on July 11, 1938, prior to the accident resulting in his death; and that to her knowledge her son had never driven an automobile.

The Sheriff of Sanpete County was then called by defendant and testified that in the early morning of August 3, 1938, he received a report of burglary from the City Marshal of Ephraim (six miles north of Manti) describing the automobile which left the scene of the offense; that he proceeded north in Manti in his car and met the car described by the marshal, a yellow coupe, coming south; that he turned around and pursued the car; could not see who was in it; followed the car about five miles south of Manti, and, although driving at eighty miles an hour, could not overtake the car; that at a fill, the pursued car left the main highway on a graded road to the east, drove through a wire fence and a deep ditch and turned over several times. That at about the time he reached this fill, he missed the boys; that he drove on quite a distance, passed two other cars carrying fishermen and then turned around and went back where he found the boys lying in an alfalfa field; both legs of the Burnett boy were fractured and young Sanders' back was broken and he never did regain consciousness; that he administered first aid and took them to the Salina hospital where both boys died the following day; that the car was demolished, and that there were two pairs of white canvas shoes in the car when it was searched.

The following offer of proof was made, out of the presence of the jury, objection to the introduction of which was sustained:

"Mr. Bagley: The defendant offers to prove by the witness now on the stand [the Sheriff] that while he was taking the two boys to the hospital from the scene of the accident that the Burnett boy, Raymond Burnett, the companion of the insured, stated that he was driving the car at the time it overturned and that when they reached Manti and saw the automobile of the sheriff that they knew that it was an officer of the law and that they were endeavoring to get away

from him; that as they were fleeing the Burnett boy was driving and the Sanders boy, the insured, was in the front seat beside Burnett, kneeling on the seat looking out the back window of the automobile watching the sheriff's car, and while he was so looking out the window he repeatedly urged the Burnett boy to step on the gas to increase the speed of the automobile."

Appellant assigns error as follows: (1) The court erred in denying the defendant's motion for a directed verdict for the reason that the uncontradicted evidence disclosed that the insured voluntarily placed himself in a situation in which death was an obvious and natural consequence, and since the death of the insured occurred while he was engaged in the commission of a crime and endeavoring to avoid apprehension following the commission of other crimes, it is contrary to public policy to permit a recovery. (2), (3) and (4) The court erred in instructing the jury as set forth in its Instructions Nos. 1, 2 and 3. (5) The court erred in refusing to allow the Sheriff to testify to what the Burnett boy told him concerning the conduct of the insured while the latter was endeavoring to avoid arrest.

The last assignment is not argued by defendant, and, as plaintiff points out in her brief, it must be considered as waived.

Under the statement that "Bodily injuries occurring as a result of misconduct of insured likely to result in death are not sustained solely through accidental means" and that "It is contrary to public policy to allow recovery for death resulting from insured's criminal conduct," appellant cites a number of cases from State and Federal Courts, and argues that:

"It is true that most of the controlling cases involve death of the insured by the use of fire arms discharged either by officers of the law or the person attacked by the insured. We submit, however, that there is and can be no distinction between those cases and the case at bar wherein the insured was killed as the result of the overturning of the stolen automobile while endeavoring to avoid apprehension and arrest. In such instance the insured has by his deliberate and intentional misconduct placed himself in a situation where death or

great bodily harm is the natural and foreseeable consequence. It is immaterial whether the instrumentality which inflicts the fatal injuries is a gun or an automobile. The important element is the circumstances which set the instrumentality in motion. In the cited cases and in the case at bar, the circumstance leading directly to the fatal injury is the intentional and wrongful conduct of the insured."

A typical case among those cited by appellant is *Metropolitan Life Ins. Co.* v. *Roma*, 97 Colo. 493, 50 P. 2d 1142. There the insured's policy carried double indemnity for accidental death not the result of violation of law by the insured. Insured was a gangster, a trafficker in narcotics, drove around in an armored automobile, attended and protected by armed guards. Some unknown person presumed to have been a member of a rival gang or of insured's own gang, entered his home in Colorado and shot and killed him. The writer is inclined to favor the dissenting opinion of Mr. Chief Justce Butler in the case, inasmuch as there was no causal connection shown between the killing and any act of committing, at the time, any violation of law by the insured.

Other cases cited by appellant are the following: *Sellars* v. *John Hancock Mut. Life Ins. Co.*, Mo. App., 149 S. W. 2d 404, wherein the insured and another held up a motorist, compelled him to drive a distance and then took over the car. They were later traced and an arrest was attempted. Insured, while fleeing into a densely wooded area, and ignoring the officer's command to stop, was shot and killed by the officer. Recovery of the double indemnity for accidental death was denied for the reason that insured by his conduct placed himself in a position where death was the likely result. In *Taliaferro* v. *Travelers' Protective Ass'n of America*, 8 Cir., 80 F. 368, the insured engaged in a heated argument with another, drew his gun, and struck his adversary a violent blow, and in the grappling the adversary drew his own gun and killed insured. Recovery for double indemnity was here denied on similar grounds. In *Winton* v. *Metropolitan Life Ins. Co.*, 174 Tenn. 252, 124 S. W. 2d 712, 714, the court said:

"All common experience goes to show that a man who goes forth on a bloodthirsty rampage, with threats to take the lives of others, 'takes his life in his hands' and should reasonably anticipate his own death." *Burt* v. *Union Cent. Life Ins. Co.*, 187 U. S. 362, 23 S. Ct. 139, 47 L. Ed. 216; *Rousseau* v. *Metropolitan Life Ins. Co.*, 299 Mass. 91, 11 N. E. 2d 921; *DeMello* v. *John Hancock Mutl. Life Ins. Co.*, 281 Mass. 190, 183 N. E. 255; *Berne* v. *Prudential Ins. Co.*, 235 Mo. App. 178, 129 S. W. 2d 92.

The facts and circumstances in the case at bar do not permit of the application to them of the principles and reasoning of these cases cited by appellant. Respondent, a mother, took the policy of insurance out on the life of an infant son, seven years of age at the time of the application, for the very natural purpose of protecting the family financially in the event of unforeseen sickness, injury or even death prior to the son's arrival at an age of responsibility,—the very purposes for which the insurance companies sell such insurance. She faithfully paid the premiums for eight years at the rate of ten cents a week. Doubtless, the insured son had no knowledge of the fact that his mother carried insurance on his life, or, if he did know, it would be a far stretch of the imagination to assume that he had such fact, and especially the double indemnity provisions, in mind at the time of the accident which resulted in his death. He was fifteen and his companion, the driver of the car, fourteen years of age. They were not armed, nor were they reputed to be dangerous characters. It cannot be said that either of the boys anticipated injury or death to result from this automobile ride, fleeing from someone they assumed to be an officer. Any number of conjectures may be indulged in, but the most that can be said is that they hoped to get away and avoid being returned to the Industrial School from which they had fled.

Respondent contends that the greater weight of authority supports the rule that violation of law is not a defense to recovery, unless expressly excepted. Counsel cite *Zurich General Accid. & Liab. Ins. Co., Ltd.*, v. *Flickinger*, 4 Cir.

33 F. 2d 853, 854, 68 A. L. R. 161, in which is quoted an oft-approved definition of "accidental means" laid down by Judge Sanborn in *Western Travelers' Ass'n* v. *Smith,* 8 Cir., 85 F. 401, 40 L. R. A. 653, as follows:

" 'An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds. On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing. * * * is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means.' "

The insured in the Zurich case died as the result of drinking wood alcohol unknowingly contained in gin cocktails served to him by his host. The court held the death to have been caused by accidental means within the meaning of the insurance policy, and, among other things, said:

"It is next insisted that the death of insured resulted from his violation of law, and that consequently there can be no recovery on the policy. The answer to this is in the first place, that it does not appear that the death of insured was the result of violation of law on his part. Assuming that the wood alcohol which caused his death was not pure wood alcohol, but was contained in a beverage which it was unlawful to sell, transport, or possess because of the provisions of the National Prohibition Act (27 U. S. C. A.), there is no evidence that insured had any connection with it, except that he drank some of it at the invitation of his host; and it has been expressly held that to drink at the invitation of the owner does not involve such possession as to constitute a violation of the act. *Colbaugh* v. *United States,* 8 Cir., 15 F. 2d 929.

"In the second place, the policy contains no provision exempting the insurer from liability for injury sustained as the result of violation of law, as did the policy in the case of *Flannagan* v. *Provident*

*Life & Accident Ins. Co.*, 4 Cir., 22 F. 2d 136, 137. In the absence of such provision, we think it is clear that the insurer is liable, notwithstanding the insured may have been injured as a result of violating the law, if it does not appear that the policy was obtained in contemplation of such violation and the danger consequent thereon. 6 Cooley's Briefs on Insurance (2d Ed.) p. 5201 et seq.; 14 R. C. L. 1226; *Jordan* v. *Logia Suprema* [*De La Alianza Hispano-Americana*], 23 Ariz. 584, 206 P. 162, 24 A. L. R. 974. The cases of *Burt* v. *Union Central Life Ins. Co.*, 187 U. S. 362, 23 S. Ct. 139, 47 L. Ed. 216, and *Northwestern Mut. Life Ins. Co.* v. *McCue*, 223 U. S. 234, 32 S. Ct. 220, 56 L. Ed. 419, 38 L. R. A., N. S., 57, relied upon by defendant, are not in point. They hold that death inflicted as punishment for crime is not one of the risks insured against in a life policy; but they do not hold that death resulting from an ordinary violation of law is not covered. It is a violation of law for two men to engage in an affray; but would any one contend that, in the absence of special provision in the policy, recovery could not be had for death resulting from such affray? *It is a violation of law to drive an automobile at a greater rate of speed than prescribed by statute; but no one would contend, in the absence of special provision in the policy, that the beneficiary of one killed while speeding could not recover thereunder.* To hold that death or injury from violation of law defeats recovery under a policy, in the absence of provision to that effect in the policy itself, would open up an avenue for evasion of liability which, so far as our investigation goes, no court has yet seen fit to open. If insurance companies desire to avoid liability on such ground, they should insert a clause in their policies to that effect." (Italics added.)

Other cases cited by respondent are: *Jordan* v. *Logia Suprema De La Alianza Hispano-Americana*, 23 Ariz. 684, 206 P. 162, 24 A. L. R. 974; *Home State Life Ins. Co.* v. *Russell*, 175 Okl. 492, 53 P. 2d 562; *Mutual Life Ins. Co. of N. Y.* v. *Guller*, 68 Ind. App. 544, 119 N. E. 173; *Townsend* v. *Commercial Travelers' Mut. Acc. Ass'n of America*, 231 N. Y. 148, 131 N. E. 871; *Collins* v. *Metropolitan Life Ins. Co.*, 232 Ill. 37, 83 N. E. 542, 14 L. R. A., N. S., 356, 122 Am. St. Rep. 54, 13 Ann. Cas. 129; *American Nat. Ins. Co.* v. *Coates*, 112 Tex. 267, 246 S. W. 356; *Fields* v. *Metropolitan Life Ins. Co.*, 147 Tenn. 464, 249 S. W. 798, 36 A. L. R. 1250; *Weeks* v. *New York Life Ins. Co.*, 128 S. C. 223, 122 S. E. 586, 35 A. L. R. 1482; *Domico* v. *Metropolitan Life Ins. Co.*, 191 Minn. 215, 253 N. W. 538.

We have examined the instructions, the giving of which is assigned by appellant as error, and the question of burden of proof raised and argued by appellant, in the light of the evidence disclosed by the record and the law relating thereto, and feel that it is sufficient to say that we find no prejudicial error committed by the trial court in those respects, nor in any other respects in the case.

The judgment of the lower court is affirmed. Costs to respondent.

WOLFE, C. J., and McDONOUGH and WADE, JJ., concur.

LARSON, Justice (concurring).

I concur. But I think there is a simpler resolution of the questions presented than that followed by Mr. Justice Moffat. Gordon Sanders, the insured, was just over fifteen years of age. He was a delinquent child, on escape from the Industrial School. True he had participated at Ogden, in the surreptitious taking of an automobile, without the consent of the owner, and in breaking into a store in Spring City and taking therefrom some shoes. At the time he met his death, he was actively participating in driving the automobile taken at Ogden, at a rate of speed far in excess of that allowed by law. But all of these things were simply acts of delinquency. Under the statute, he was not a felon; he was not a criminal trying to escape; in law he had not committed a crime, and therefore never came within the rule that one who meets death as a result of his own criminal conduct thereby voids his life insurance policies. Under the common law, a person under 7 years of age was conclusively and unrebuttably presumed incapable of committing a crime; a person from 7 years to 14 years of age was presumed incapable of committing a crime, which presumption was rebuttable by the state; a person over 14 years of age was presumed capable of committing a crime, which presumption was rebuttable by the accused. 31 C. J. pp. 1096-7. Tendency

and movement in legislation has been to increase the limit of ages in which these presumptions apply. 31 C. J. 1097. Thus Texas raised the 7 year limit to 9 years, Georgia and Illinois to 10 years, Arkansas and Minnesota to 12 years, Oklahoma to 16 years. *Ex parte Hightower*, 13 Okl. Cr. 472, 165 P. 624; *In re Powell*, 6 Okl. Cr. 495, 120 P. 1022. Texas has gone from 9 to 13 years; Georgia 10 to 14 years; Arkansas 12 to 14 years, *Dove* v. *State*, 37 Ark. 261. Like many other states, Utah has legislated on this matter, mostly through its juvenile court legislation. Under our first juvenile court act it was held that juvenile court proceedings did not come within what is known as criminal proceedings, and children were not considered as criminals, *Mill* v. *Brown*, 31 Utah 473, 88 P. 609, 120 Am. St. Rep. 935. That policy developed further until the statute now declares:

"No child under eighteen years [of age] shall be charged with or convicted of a crime in any court except as provided herein." U. C. A. Section 14-7-6.

By Section 14-7-4, U. C. A.

"The juvenile court shall have exclusive original jurisdiction in all cases relating to * * * *delinquency* of children who are under eighteen years of age, except in felony cases *as hereinafter provided*, and the custody * * * of *delinquent children*." (Italics added.)

In *Jensen* v. *Sevy, Dist. Judge,* 103 Utah 220, 134 P. 2d 1081, this court held that this section meant *"exclusive"* in its strongest, most positive, and decisive meaning. Section 14-7-5 defines "Delinquent child," inter alia as a person under eighteen years of age who has violated any state law or ordinance or regulation of a subdivision of the state. The result therefore is that with the one exception to be noted and discussed hereafter a person under eighteen years of age, who violates a law of the state, is merely a delinquent child, and has not committed a crime or public offense.

I note now the one exception referred to, and noted in Section 14-7-4, U. C. A., supra. Noting the provisions of that

section further than was done above, we read in subdivision (2)

"In any case where a juvenile fourteen years of age or older. is charged with an offense *which, if committed by an adult, would be a felony,* the juvenile court shall have concurrent jurisdiction with the district court." (Italics mine.)

It goes on to provide that the juvenile court shall hear the matter and make a determination thereof, or if in its judgment the interests of the state require, it shall hold the child for prosecution in the district court. Subdivision (5) then provides that the distritc court shall then sit as a committing magistrate, and if in his judgment, so sitting, the prosecution would be harmful to the best interests of the juvenile, he sends the case back to the juvenile court for disposition. We now refer again to Section 14-7-6, which declares that if in any criminal or quasi-criminal proceeding in *any* court other than the juvenile court, it shall be ascertained that the person so charged or on trial, was, at the time of the alleged offense, under 18 years of age, *it shall be the duty of such court* to transfer such case immediately to the juvenile court, which juvenile court shall then dispose of the case as though it had been originally commenced therein.

These statutes seem to establish indisputably that a juvenile, as that term is used in the statute, cannot commit a crime; and is not subject to criminal prosecution; that a person over eighteen years of age is subject to criminal prosecution for any offense; that a juvenile is subject to the exclusive jurisdiction of the juvenile court (a non criminal proceeding) ; that when a person over 14 years and under 18 years of age is accused of doing *an act which if committed by an adult would have been a felony,* the juvenile court shall determine whether such child shall be considered as a juvenile, and tried for delinquency, subject to treatment and penalty the juvenile court can impose; or whether the child, because of its state of mind, reactions, behavior and conduct, should in the interests of the state, be considered as an adult,

and lose its juvenile standing and protection, and should be subect to punishment. The dominant purpose and aim of the Juvenile Law is not to punish, but to change the line of direction of conduct of the boy or girl and to impress on the plastic mind, the necessity of good habits and correct conduct. *State ex rel. Roberts* v. *Johnson,* 196 Iowa 300, 194 N. W. 202. It has no purpose except to effect and mold behavior. If the Juvenile Court decides the child, in the interests of the State should be subject to punishments which it cannot inflict, it binds the child over to the District Court. Thereupon, the district judge sits as a committing magistrate and hears the matter. If the district judge decides that the best interest of the child does not require that he be punished beyond that which the Juvenile Court can inflict, the case must be remanded to the Juvenile Court. If the District Judge decides as the Juvenile Judge had decided that greater punishment is for the *best interests of the child,* he binds the juvenile over to the district court for trial on a felony. These actions of the Juvenile Judge and of the District Judge have the effect of taking the child out of the class designated by law as juveniles, and for purposes of criminal prosecution, puts him in the class of adults. This must follow from the language of the statute, which four times declares *"an act* (or offense) *which if committed by an adult would be a felony."* (Italics added.) That certainly has implicit in it the declaration that if committed by a juvenile it is not a felony. The conviction of a person of a felony, even though such person be under eighteen years of age, must therefore rest upon a determination that such person, at the time of the commission of the offense, was not in that class, which under the statute we commonly designate as juveniles. Since Section 14-7-5 of the statute designates "child" as any person under 18 years of age, and states that any child who violates a state law is a "delinquent child," and section 14-7-4 gives the Juvenile Court exclusive original jurisdiction of all cases relating to the delinquency of children, which includes all cases involving the violation

of state law by children, it must follow that a person under eighteen years of age who violates a state law, even though it be by act which if committed by an adult would be a felony, is in law merely a delinquent child, until such time as the courts in the way indicated above have determined and decided he is not entitled to the benefits, standing or protection of juvenility, which is necessary to put him in the position of one guilty of criminal conduct.

Since Gordon Sanders at the time of his death was a "delinquent child" and conditions did not exist or had not been met by which his conduct, out of which or in the course of which, he met his death could be termed criminal conduct, or for which he was at the time of his death subject to criminal prosecution for a felony, it cannot be said that he met his death as a result of the commission by him of a felony. I believe that the rule contended for by appellant, that one who meets death as a result of his own felonious conduct voids his life insurance policies, is correct and public policy requires its observance. But for the reasons shown above Gordon Sanders did not fall in that category. I, therefore, concur in affirming the judgment.