# HALES v. COMMERCIAL BANK OF SPANISH FORK et al.

No. 7046.   Decided September 29, 1948.   (197 P. 2d 910.)

See 53 C. J. S., Libel and Slander, sec. 115. 33 Am. Jur. 127. Communication to agent or representative of person defamed as publication or privileged, note 172 A. L. R. 208.

*Christenson & Christenson,* of Provo, Utah, for appellant.

*Elias Hansen,* of Salt Lake City, for respondents.

McDONOUGH, Chief Justice.

Plaintiff sued defendants on two counts for alleged defamation. In the first cause of action plaintiff alleged that defendant Dixon, while acting as cashier of defendant bank, said of plaintiff to Max Packard:

"I figured that Duane had taken the check, forged his mother's name and taken the money."

In the second cause of action, plaintiff alleged that said cashier, in the presence of Max B. Hales, said of plaintiff:

"You can even see where he cut off the top of the check and changed the date on it,"

and that

"The best thing for him to do is to pay off the check because the FBI is going to investigate it."

In each count plaintiff alleged that said words were uttered maliciously, and that the same were false and defamatory, and that plaintiff was injured in his reputation, to his damage in a sum alleged.

Defendants denied the alleged utterances, and by way of affirmative defenses alleged that if such words were uttered, they were spoken in the course of an investigation of the alteration of a check which had been cashed at defendant bank, and that said statements, if made, were privileged, uttered in good faith and without malice, and that plaintiff was not damaged. In view of the conflict in the evidence as to whether defendant uttered the alleged defamatory statements concerning the plaintiff, the basic issue on this appeal is whether the circumstances or the occasion for the alleged utterances, gave rise to a qualified privilege, and if so, whether the privilege was, as a matter of law, abused or exceeded. The jury returned a verdict in favor of defendants on each cause of action. Plaintiff seeks reversal of the judgment, claim-

ing that the trial court committed prejudicial error in the charge to the jury, by instructing that the communications were privileged as a matter of law. Respondents cross-assign errors, contending that the judgment should be affirmed because the instructions given, to which defendants excepted, were unduly favorable to plaintiff. However, the cross-assignments of error are not argued in the brief of respondents. They are consequently waived. See *Sanders* v. *Metropolitan Life Ins. Co.*, 104 Utah 75, 138 P. 2d 239.

A statement of the evidence, particularly the testimony produced by plaintiff and his witnesses, is necessary to determine whether the trial court committed prejudicial error in giving the challenged instructions.

Plaintiff's mother received old age assistance from the State. A check in the amount of $40 issued to her under date of November 15, 1944, and forwarded to her by mail, was never endorsed by her, and it was replaced upon application certifying that it had been lost. About a year later, the original check was cashed at the defendant bank. Some person had simulated the signature of the payee, changed the date by altering the numerals 1944 to 1945, and had cut off the printed statement from the top of the instrument which limited the time within which the check was required to be cashed after date of issue. After the check went through the regular channels for collection, it was returned to defendant bank by reason of the alteration, and the Department of Public Welfare upon notification started an investigation.

In January, 1946, shortly after the bank was notified of the alteration of the check, after payment was refused by the State, defendant Dixon who was cashier of defendant bank, spoke to plaintiff's witness Max Packard about the check. Dixon told Packard that the bank had the check with his endorsement and that the check was "no good." There appeared on the check as endorsements, the name of the payee, that of one William Johnson, and that of Max

Packard. After examining the check at the bank rather hurriedly, Packard paid the face amount thereof to the bank and received the check. A few hours later, he returned the check to the bank and informed a teller that he had concluded that the check had not been endorsed by him, but that some third person· had traced his signature in carbon onto the check and then had written over said tracing in ink. He asked for a refund, declaring the signature to have been traced and not to be his own. Dixon as cashier thereupon refunded to Packard the $40, and recovered possession of the check.

Defendant Dixon testified that when he refunded the $40, Packard promised to cooperate with the bank to ascertain who had forged his signature. On rebuttal Packard stated that he did not remember making such promise, but he did not deny that there was such a conversation. After two weeks later, while Packard was at defendant bank on some other business, the nature of which he did not recall, he had a conversation with Dixon concerning this check. According to Packard, Dixon stated that he suspected plaintiff because plaintiff lived on the same lot where his mother resided; that he had learned that plaintiff had collected her mail while she was in California; and that one could see where the date had been changed on the check. Dixon stated that he was going to get the FBI on the case. At a later date, Dixon requested Packard to get a sample of plaintiff's signature to enable him to make a comparison. Although Packard said that he had one of plaintiff's checks at the time, he indicated that he did not want anything more to do with the check in question, and said he thought Dixon himself should obtain such signature.

During the investigation by the Welfare Department, when a case worker contacted the bank, Dixon stated to her that she was authorized to state to Mrs. Hales, to whom the check had been made out, that the bank suspected some one in her family. In the course of her investigation the case

worker so notified the family. Max B. Hales was present at his mother's home at the time of the visit of the case worker. Thereupon Max B. Hales, brother of plaintiff, came to defendant bank and requested permission to examine the check, and his request was granted. He engaged in conversation with defendant Dixon. On cross-examination he stated that he went to the bank following the visit of the case worker, to find out if he could, who was under suspicion, whether he was the one or whether it was some other member of the family.

The witness was asked to sign his name, which he did without hesitation. Defendant Dixon then showed the witness plaintiff's signature (which he had obtained) and the simulated endorsement of Mrs. Hales' name on the check, and Dixon asked the witness if it did not look like plaintiff's writing. The witness replied that he did not think so; that he was sure it was not Duane's signature. Max B. Hales testified that Dixon thereupon said to "look and see where he cut off the top of the check and changed the date on the check." When asked to whom Dixon referred, he said "Duane." The witness declared, "I don't think he would do that, and any way that is not his signature." Dixon then said he had not been in the bank for 10 or 15 years "without knowing a little bit about signatures," and that he was going to get the FBI on the case, adding that "to save a lot of family trouble it would be a good idea for one of the family to come in and pay this $40 check." Max B. Hales testified that he reported this conversation to his brother, the plaintiff; that he did not believe plaintiff had forged any signatures on the check, and that he thought just as much of plaintiff after this conversation as he did before; and that he talked to Dixon because he was "interested" in finding out whether he or some one else was accused in connection with the check.

The following day plaintiff came to the bank and interviewed Dixon about the check. He testified that he said to Dixon: "From what I hear around town this don't look

too good to me," and that Dixon replied, "It certainly does-n't." When asked what Dixon had against plaintiff on the check, Dixon answered, "I have got plenty, but I am not saying." He later said the matter was being turned over to the FBI, and when plaintiff asked if the bank wanted plaintiff to pay the $40, Dixon allegedly said, "It would certainly save a nasty situation on the part of your family."

Counsel do not seriously disagree as to the general rules relative to privilege, but rather as to the application of such rules to the facts of the instant case. Whether a factual situation gives rise to a qualified privilege, is admittedly a question of law for the court. See Newell on Slander & Libel, (4th Ed.), p. 588. Appellant contends in substance: (1) That there was here no privileged occasion for the defamatory communications; and (2) that even if there were a qualified privilege, it was abused or exceeded.

Both appellant and the respondents rely on Sec. 103-38-8, U. C. A. 1943, for the definition of privilege. This provision is a part of the Penal Code, relating to criminal libel:

"A communication made to a person interested in the communication by one who is also interested, or who stands in such relation to the former as to afford a reasonable ground for supposing his motive innocent, is not presumed to be malicious, and is a privileged communication."

Respondents take the position that the communication to Packard was clearly privileged since both the bank and Packard had been victimized by the fraudulent act. As pointed out in 33 Am. Jur. 165:

"Thus, it is held that mutual victims of a fraud or other tortious act are not liable for damages because of defamatory statements contained in communications between them for the purpose of ascertaining the identity of the tort-feasor or of bringing about his apprehension." See *Edwards* v. *Kevil*, 133 Ky. 392, 118 S. W. 273, 28 L. R. A., N. S., 551, 134 Am. St. Rep. 463, and *Klinck* v. *Colby*, 46 N. Y. 427, 7 Am. Rep. 360.

Patently, Packard and the bank were both victims of the forgery. The fact that when Packard convinced the bank that his signature had been cleverly traced and that he had not endorsed the instrument in question, the bank refunded the money he had paid, would not alter the fact that both were victims although in successive order. Packard and the bank were both legally interested in the communication which would relate to the identity of the perpetrator of the fraud. The statute merely requires that both persons be interested in the communication which contains the defamatory matter. As epitomized in the Restatement of Law, Torts, Defamation, sec. 596:

"An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject-matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know."

Furthermore, the statute provides that the communication is privileged if the recipient "stands in such relation to the former [the publisher] as to afford a reasonable ground for supposing his motive innocent." This phraseology is such as to encompass a number of situations. One is contemplated by Sec. 594, Restatement, Torts, (vol. 3) p. 242:

"An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that

"(a) facts exist which affect a sufficiently important interest of the publisher, and

"(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."

## Comment (b) to such section is here pertinent:

"If facts actually exist which affect a sufficiently important interest as stated in Clause (a), and if the publication is made to a proper recipient, as stated in Clause (b), the occasion is privileged. If the interest is not in fact affected, or if the recipient of the publication is not in fact a proper person to receive the information, the occasion is nevertheless privileged if the publisher reasonably believes that such is the case. The publisher's lack of belief in the truth of the

defamatory matter published, or his lack of reasonable grounds for so believing, while immaterial to the existence of the privileged occasion, is important as constituting an abuse of the occasion which deprives him of the protection which it would otherwise afford."

Likewise pertinent is the following from comment "c" to Sec. 594:

"*   *   *   An interest may be protected by law either directly or indirectly  *   *   *   Thus, the interest may be of such social importance that the criminal law imposes a penalty upon one who invades it. Again, it may be directly protected by an action for damages against the invader. If the interest is of sufficient importance to receive such direct legal protection, it is indirectly protected by the privilege arising from the occasion described in this Section  *   *   *"

Unquestionably defendants had such an interest in the subject matter as to bring them clearly within the last quoted comment. The evidence is undisputed that defendant bank had been defrauded by means of a forged endorsement, in the face amount of Hales check. The perpetrator of the act which defrauded the bank was subject to penalty under the penal code of this state as well as liable in an action for damages.

Likewise, Packard's knowledge of the suspicions of defendant Dixon as to the guilty party would in all likelihood be of service in the lawful protection of the bank's interest. Packard's endorsement had been forged on the check. Not only might Packard have a signature of the suspect, but he might have knowledge or means of obtaining information as to whether the suspect might have ready access to instruments bearing Packard's genuine signature from which a carbon tracing was made on the check. Within the rules cited, the communication to Packard was clearly conditionally privileged, and the court did not err in so instructing the jury.

We proceed to a consideration of the defamatory statements made by defendants to Max B. Hales, as testified to by him. Insofar as the testimony of Max reveals, he merely

asked to see the check. After examining it, on Dixons' request he signed his name. Defendants thereupon in effect stated that in the opinion of defendant Dixon, plaintiff had forged the check. Appellant contends that such words being defamatory, the record does not show an occasion conditionally privileged. Of course, the mere fact that the recipient of a communication is related to the plaintiff does not make a communication to him conditionally privileged. See *Thorn* v. *Moser*, 1 Denio, N. Y., 488, and 53 C. J. S., Libel and Slander, § 81, p. 132 and cases cited. The facts and circumstances must be such, under the rules cited, as to show that the recipient has an interest in the communication or that his knowledge of the defamatory matter would be of service in the lawful protection of the publisher's interest. While Max B. Hales testified that he went to the bank to find out who of the family was suspected, according to his testimony he did not so state to Dixon. But his testimony reveals that he went to the bank immediately after the visit of the case worker to his mother's home where he resided. It was reasonable for Dixon to assume that he came as in fact he did, in response to the message conveyed by her at Dixon's request.

Assuming that the circumstances were such as to induce a reasonable belief on the part of Dixon that Max came to the bank to inquire as to which or if any specific member of the family was under suspicion, was the occasion a conditionally privileged one for publication of the defamatory matter? We think not. True, as pointed out above, facts existed which affected a sufficiently important interest of the publisher to meet the requirement of the rule set forth in Section 594 of Restatement of the Law, supra, but it is difficult to see how the recipient's knowledge of the defamatory matter—the charge in effect that plaintiff had forged his mother's signature on the check— would be of service in the lawful protection of that interest. Dixon testified that he was interested in securing reimbursement of the amount of the check. If the communication of

the defamatory matter to Max would be of service to that end, it could be accomplished only by Max communicating the charge to plaintiff, who might thus be induced to make payment. This could as readily be accomplished by a communication directly with plaintiff himself. And if the publication to Max with the stated purpose in mind would be privileged, it would seem that its publication to any one with instructions to convey the information to the plaintiff would also be privileged.

There is nothing in the record to indicate that on the occasion in question, Max was acting as agent for the plaintiff, nor was agency alleged in defendants' answer.

Max testified to the effect that he did not believe, by virtue of the publication or otherwise, that plaintiff had forged the check and that it did not in any way lessen plaintiff in his esteem. While such evidence might suggest a lack of damage upon the part of the plaintiff, still, the words being slanderous per se, general damages would be presumed. At all events, the plaintiff would be entitled to nominal damages and consequent vindication.

The judgment is affirmed as to the first cause of action and reversed as to the second cause of action and remanded to the district court with directions to grant a new trial thereon. Costs to appellant.

WADE and LATIMER, JJ., concur.

WOLFE, Justice (concurring in part, dissenting in part).

I concur both in the reasoning and in the results of so much of the prevailing opinion as holds the communication to Packard privileged. I agree with Mr. Justice Pratt that the communication to Max Hales was qualifiedly privileged. I think the fact that Max and Duane were so closely related and were part of the family, some one of whom the social worker told was under suspicion, made the communications

by Dixon to Max qualifiedly privileged. Max had an interest under those circumstances in determining not only that he was not the one under suspicion but which member of the family was under suspicion. This made the statement of Dixon that Duane was suspected and the reasons why he was suspected privileged.

I therefore conclude that the court did not err in instructing the jury that such communication was privileged as a matter of law. I am of the opinion that the judgment should be affirmed as to both causes of action.

PRATT, Justice.

I dissent.

The majority opinion in holding the lower court's instruction as to qualified privilege bad, proceeds on the theory that since Dixon testified that his interest was in securing the amount of the check, then he could not justifiably have made such a communication to the brother, but only to Duane Hales personally, and that Max Hales stands in the matter, in the same position as would an utter stranger.

Let us analyze the situation to see if this is so.

The communication which reached Max Hales and informed him of Dixon's suspicions in the matter of the check, came from the State Welfare Worker, to whom Dixon had stated that he suspected some member of the Hales family. There is no indication up to this point as to which member of the family was suspected, and Max Hales, when he went to the bank, did so knowing only that some family member was suspected. Furthermore, Max testified that immediately after the conversation with the Welfare Worker he went to the bank to make inquiry. These are not bare isolated occurrences, but are all connected events which must be viewed as a whole. The entire picture then is this: The Welfare Worker went to Dixon as a part of her investigation of the loss of the check; Dixon communicated to her his

suspicion; she requested and was granted authority to communicate the suspicion to Mrs. Hales for the reason as she testified that the boys should clear themselves in the matter. The Welfare Worker, the same day, communicated the suspicion to Mrs. Hales in the presence of Max. Immediately thereafter Max went to the bank. The testimony reveals that he said to Dixon: "Would you mind showing me the check." Dixon also testified that Max asked, "Do you think I did it?"

However, aside from any particular words spoken, it would seem that Dixon could properly conclude here is a member of the family coming in response to a communication from the Welfare Worker, to try to iron out this trouble. This would seem under the circumstances to be a natural and justifiable assumption on his part.

On the other side, I think we may conclude that Max Hales when he appeared at the bank was motivated by two interests—a personal interest, and a family interest. Of the two, it seems likely that the latter was equally pressing with the former, since, as he testified, he was overseas serving with the Armed Forces at the time the check disappeared. This being so it seems doubtful that Max would be too concerned about himself personally since he could so easily clear himself. It hardly fits in with his desire to see the check. If his interest was purely in removing suspicion from himself, then all that would have been necessary would have been to ask Dixon if he was suspected, and inform Dixon that he was not present at the time the check disappeared. It would appear that both parties concluded this was a conversation between the bank representative on the one hand and a family representative on the other hand, for the purpose of getting at the root of the trouble; the one to get the money back, and the other to clear or protect the family name and the family members. It is my thought that under such circumstances the conversation was confidential and privileged. In other words, an interest in the subject matter should not be limited to merely what might be termed a

selfish interest. The word "interest" is broad and may include many kinds and degrees of connection with the subject matter.

Let us now consider the case of *Thorn* v. *Moser*, 1 Denio, N. Y., 488 cited in the majority opinion. A perusal of the facts in that case reveals the following differences from the present fact situation: First, that the recipient of the communication was related to the plaintiff by marriage only, thus there would exist no special interest in protecting the family name, and the defendant probably would not be justified in concluding that there was any such interest; Second, the communication was repeated to the recipient in the presence of an attorney who was there at his request, after he had specifically cautioned and warned the defendant not to make such a charge against the plaintiff; and Third, the accusation as communicated originally was directed toward a particular person, and thus there was no uncertainty on this point when the recipient came in to discuss the problem.

As stated in the majority opinion the mere fact that the recipient is related to the plaintiff does not make the communication conditionally privileged. Each case must of necessity, turn on its own facts, and qualified privilege must rest upon the particular facts and circumstances from which it arises. At best qualified privilege merely defeats a presumption of malice where the words spoken are, by their nature, slanderous per se.

A fact situation wherein qualified privilege arises is that wherein school authorities make communication to the parent of a child who has been dismissed, stating the reasons therefor. Such a case is *Kenney* v. *Gurley*, 1923, 208 Ala. 623, 95 So. 34, 26 A. L. R. 813, in which a young girl was sent home from a boarding school, and a letter sent to her parents indicating that the girl was suffering from a veneral disease and for that reason was unsuitable as a student. The court held the communication privileged stating that the school

authorities owed a duty, social and moral to communicate to the parents the progress of their children and any reasons for their dismissal. A similar rule was laid down in the case of *Baskett* v. *Crossfield*, 1920, 190 Ky. 751, 228 S. W. 673, which involved an inquiry by the father as to why his son had been expelled from the school. In the latter case, there had been a request for information; in the former case the information was volunteered.

More closely in point however, and cases in some respects on all fours with the present case are the following:

In the case of *Ebaugh* v. *Miller*, 1929, 127 Kan. 464, 274 P. 251, 252, an action for slander was brought based upon communications made to the brother of a girl who was discharged by the school board from a teaching position as a result of information communicated to the school board by the school janitor indicating improper conduct between the plaintiff and the local pastor. The plaintiff's brother heard that there had been some sort of investigation; learning some of the details from plaintiff's mother. He went to the president of the school board for further information. He went to "find out the truth of the rumors he had been hearing." Two others also made inquiries; Johnson, whose wife was a cousin of plaintiff, and one McGiffert who was a trustee of the pastor's church. The trial court instructed that each of the three had an interest in the subject to which their inquiries related and defendant's communications to them were conditionally privileged. In giving the reasons for affirming the trial court the Supreme Court of Kansas indicated wherein lay the privilege in each instance:

"Clarence Ebaugh was plaintiff's brother." "Johnson was a relative of plaintiff by marriage, was in fact interested in the re-employment of plaintiff and was a citizen commendably interested in decent discharge of the school board's official duty in the matter of employing teachers. McGiffert was a trustee of the church of which plaintiff was a member, holding the office of clerk, and whose pastor was involved. The result is defendant's answers to the inquiries of Ebaugh, Johnson, and McGiffert were conditionally privileged."

In the case of *Zanley* v. *Hyde,* 1919, 208 Mich, 96, 175 N. W. 261, 263, the plaintiff had been staying with the defendant's family at plaintiff's request. After he left, two children's banks and contents were missing, and certain evidence pointed to the plaintiff. Defendant wrote a letter to plaintiff's father after first having written one to plaintiff demanding return of the banks and money. In the letter to the father defendant indicated that the plaintiff took the money, that his desire was to recover the money and he did not desire to make an arrest. This communication was of course unsolicited. The court in holding that the occasion was qualifiedly privileged said the following:

"If the defendant believed that the plaintiff had taken the banks and the money therein contained, on his failure to get a reply from plaintiff a moral duty certainly rested on him to communicate the facts to plaintiff's father. This seems particularly true in view of the relationship existing between the families. It is the occasion, and not the language used, which determines the question."

A case which gets even closer is the case of *Western Union Tel. Co.* v. *Buchanan,* Tex. Civ. App. 1923, 248 S. W. 68, 70. In that case one Cline who was plaintiff's superior officer in the company went to her brother whom he had never previously seen, but who was a local banker, and unsolicited told the brother that the plaintiff had misappropriated money belonging to the company. The court said that Cline had an interest in the subject matter under investigation since it was his special duty to investigate plaintiff's management, etc. The court went on to use the following language:

"* * * A brother always has an interest in his sister's welfare, social, financial, or moral, that would materially affect her. That duty he recognized, and to that end promptly called Cline to an account for the supposed insult and indignity. But the alleged libelous and slanderous terms applied to his sister, a female relative, spoken in the exercise of a social duty, showing a good motive by Cline, a person interested, and spoken to a person interested, as the brother of the appellee, with a view to the welfare of the parties concerned and thus communicated to a relative, has been frequently held to be qualifiedly privileged. (Citing authorities.)"

In view of the facts and circumstances of the present case, the court could properly conclude that there existed ample interest by virtue of the family relationship and the appearance of Max Hales in an attitude of inquiry, to justify holding the occasion qualifiedly privileged.