This is an action by the beneficiary of two life insurance policies against the defendant, Metropolitan Life Insurance Company, to recover accidental death benefits. The policies were issued on the life of Jeffrey Johnson and were in full force and effect as of the date of his death on September 5, 1964. The defendant paid the face amount due under each policy but has refused to pay any additional accidental death benefits. The policies in question are plaintiff's exhibits A and B. If the plaintiff is entitled to recover the additional benefits, it has been agreed that the accidental means death benefit under exhibit A is $440, and the same benefit under exhibit B is $3330, or a total of $3770.
All of the allegations of the plaintiff's complaint are admitted except the allegation of paragraph 6 that the insured died from accidental means. Thus, the only issue tried to the court on the complaint is whether the insured "sustained bodily injuries through . . . accidental means, resulting directly and independently of all other causes" in his death, under the terms and provisions of the policies in issue.
By way of counterclaim, the defendant alleged that it received two assignments from the Petroleum Heat and Power Company, Inc., of Stamford in the amount of $500 under each policy, but that through mistake and inadvertence in its home office the company paid the face amount due under the policies without honoring the assignments or deducting any amount for payment of them. At trial, it was stipulated that the parties would ascertain the exact amount still due to Petroleum Heat and that, in the event the plaintiff was entitled to recover, this amount would be deducted from the judgment upon the representation that the defendant would see to its payment. Through correspondence with *Page 400 
Petroleum Heat it has been ascertained that the present principal and interest due on this account is in the total amount of $123.30. Counsel for the plaintiff has been notified of this figure, and it is stipulated between the parties that this amount may be accepted by the court for purposes of its decision, as hereinbefore indicated.
The pertinent provisions of plaintiff's exhibit A state as follows: "Upon receipt of due proof that the death of the Insured resulted, directly and independently of all other causes, from bodily injuries caused solely by external, violent, and accidental means, the company will pay, as an additional death benefit, an amount equal to . . . [$440.00]." Plaintiff's exhibit B provides in pertinent part: "Company will pay, subject to the provisions of this policy, to the beneficiary . . . an additional sum equal to . . . [$3,330.00] upon receipt of due proof that the death of the Insured occurred as the result, directly and independently of all other causes, of bodily injury caused solely by external, violent and accidental means."
The defendant also pleaded by way of special defense that with respect to plaintiff's exhibit A the policy specifically excluded the additional benefit if the insured's death was "the result of participating in, or attempting to commit an assault," and plaintiff's exhibit B excluded the additional benefit where the insured's death "results from committing an assault."
The subordinate facts in this case are largely undisputed. On September 5, 1964, the insured, Jeffrey Johnson, spent the day at a wedding and reception for his older brother. It is apparent that he was drinking heavily during the day, since a postmortem blood test revealed an alcohol content of nineteen-hundredths of one percent, by weight, *Page 401 
according to the report of the state toxicology laboratory. Patrolman Watson Walker of the Stamford police department, according to his statement, was driving a radio patrol car on the 3:30 to 11:30 p.m. shift on the evening in question, with his partner, Patrolman Robert C. Tymon. At about ten minutes past ten, as they approached the intersection of West Broad Street and Stillwater Road, a red convertible subsequently identified as belonging to the father of the insured, which had been traveling north on Stillwater Road crossed the intersection and turned west. the convertible was going at a very high speed and did not stop at the intersection. It passed a "Keep Right" sign on the left side, and when they saw this violation the officers started to pursue the convertible. Patrolman Tymon turned on the flashing red light, and they blew the siren on the police car. The driver of the convertible refused to stop and continued north on Stillwater Road, gaining speed and showing no signs of stopping. In his testimony on the witness stand, Officer Walker gave his opinion that the driver of the red convertible must have seen the light and heard the siren and yet refused to stop and in fact continued to gain speed. The officer stated that the police car was traveling at seventy miles an hour and was losing ground to the convertible which, in his opinion, was going at least eighty miles an hour. This was a two-lane winding road in a residential area of town.
The statements indicate that the fleeing car was then being driven in a very erratic manner, all over the road, and it forced three or four oncoming cars off the road. The pursuit continued at these high speeds and in this wild manner until the convertible rounded a bend to the left and the officers lost sight of it. Seconds later, a bright flash of light appeared in the sky, and when the police reached the area it was darkened by a thick cloud of dust. The *Page 402 
car had first struck a stone wall, careened 90 feet and sheared off a telephone pole, flipped over and continued 195 feet more before it stopped on the other side of the road upside down. While it was dark at 10:14 o'clock at night, the weather was clear and the blacktop pavement was dry. A boy subsequently identified as Thomas Sarantos was found lying in the road and apparently dead some 55 feet from the stopped position of the overturned car. The insured lay face down in the automobile with his right hand gripping the steering wheel. A black shoe was found on the floor of the driver's side, wedged between the brake pedal and the accelerator pedal. This was subsequently identified as the right shoe of the insured, which was missing from the body after the crash and matched the left shoe found on the body. The insured's body was lying face down, draped over the driver's seat, with the feet protruding into the rear of the car. Something more than the mere physical location of the body is necessary to establish who, in fact, was operating this vehicle. How Johnson's body came to be situated where it was found can only be the subject of speculation.
The only conclusions which the court can reach on the facts are that the vehicle was involved in an accident and that the insured's death was caused solely by external, violent, and accidental means. Even if the court were to conclude that the insured, Jeffrey Johnson, was the operator of the motor vehicle, it would still have to find for the plaintiff. The defendant's contention is that the death was not caused by "accidental means." The position of the defendant is apparently that because the vehicle was traveling at a high speed, the collision was not "accidental."
There are two cases which are, factually, virtually identical to the instant case. In Metropolitan Life *Page 403 Ins. Co. v. Henkel, 234 F.2d 69 (4th Cir. 1956), the insured was fleeing from the police at speeds of ninety miles per hour or more. The insured came to a fork in the road, hesitated in deciding whether to take the road to the right or the left, and went upon the soft shoulder of the road. The car turned over, and the insured died as a result of injuries sustained. The court, in holding that the insured's death was the result of accidental means, stated (p. 71): "It is true, of course, that insured was exposing himself to danger in driving the car at such a high rate of speed; but `voluntary exposure to danger by the holder of an accident insurance policy will not defeat recovery for an injury caused by accidental means, where such exposure is not an exception in the policy, and the insured has no intention of producing the injury received'. 29 Am. Jur. p. 716. . . . Nor does the fact that the speed of the automobile was in violation of law affect the coverage of the policy, in the absence of an exception to that effect. Poole v. Imperial Mutual Life Health Ins. Co., 188 N.C. 468 . . . ; Zurich General Accident Liability Ins. Co. v. Flickinger, 4 Cir., 33 F.2d 853, 856. . . . As said by this court in the case last cited: `If insurance companies desire to avoid liability on such ground, they should insert a clause in their policies to that effect.'"
The second case is Sanders v. Metropolitan LifeIns. Co., 104 Utah 75. The insured, a fifteen-year-old boy, was a passenger in a car operated by a fourteen-year-old companion. Both boys had escaped from a home for delinquent boys and were fleeing from the police in a stolen car and traveling at speeds in excess of eighty miles per hour. The insured was in the front seat, looking at the pursuing police car, and implored the driver to step on the gas and increase speed. The court held (pp. 82-84): "respondent, a mother, took the policy of *Page 404 
insurance out on the life of an infant son, seven years of age at the time of the application, for the very natural purpose of protecting the family financially in the event of unforeseen sickness, injury or even death prior to the son's arrival at an age of responsibility, — the very purposes for which the insurance companies sell such insurance. She faithfully paid the premiums for eight years at the rate of ten cents a week. Doubtless, the insured son had no knowledge of the fact that his mother carried insurance on his life, or, if he did know, it would be a far stretch of the imagination to assume that he had such fact, and especially the double indemnity provisions, in mind at the time of the accident which resulted in his death. He was fifteen and his companion, the driver of the car, fourteen years of age. They were not armed, nor were they reputed to be dangerous characters. It cannot be said thateither of the boys anticipated injury or death toresult from this automobile ride, fleeing from someonethey assumed to be an officer. [Italics supplied.]. . . `In the second place, the policy contains no provision exempting the insurer from liability for injury sustained as the result of violation of law. . . .In the absence of such provision, we thinkit is clear that the insurer is liable, notwithstanding the insured may have been injured as a result of violating the law, if it does not appear that the policy was obtained in contemplation of such violation and the danger consequent thereon. [Italics supplied.]. . . It is a violation of law to drive anautomobile at a greater rate of speed than prescribedby statute; but no one would contend, in theabsence of special provision in the policy, that thebeneficiary of one killed while speeding could notrecover thereunder. To hold that death or injury from violation of law defeats recovery under a policy, in the absence of provision to that effect in the *Page 405 
policy itself, would open up an avenue for evasion of liability which, so far as our investigation goes, no court has yet seen fit to open. If insurance companies desire to avoid liability on such ground, they should insert a clause in their policies to that effect.'"
The principles set forth in both Henkel and Sanders
are recognized by our courts. In O'Brien v.John Hancock Mutual Life Ins. Co., 143 Conn. 25,29, the court held: "By incorporating . . . [exceptions] into the policies, the defendant concedes that the insured risk was defined so broadly that the addition of exceptions was necessary to limit its scope." Furthermore, it is a well-recognized principle that where a policy is susceptible to two constructions, the words used should be interpreted most strongly against the insurer. Ibid.
The phrase "accidental means" is obviously extremely broad. So broad, in fact, that the defendant has seen fit to add eleven exceptions in the coverage of one policy and five exceptions to the other. Clearly, the defendant could have excluded coverage in the event that death occurred as a result of traveling at a high speed in an automobile or while being pursued by the police. It did not do so. Its failure to do so impels the court to conclude that the insured's death was caused by accidental means.
It is interesting to note that the Metropolitan Life Insurance Company not only is the defendant in this case but also is involved in both Henkel andSanders, supra. In this case, as well as in the other two cases, death was the result of an automobile accident. In each case, the insured was fleeing from the police while traveling at a high speed. In each case, the policy provided for additional death benefits in the event death occurred through "external, violent and accidental means." In none of these *Page 406 
cases did the policies contain an exclusion or exception for death which occurred as a result of fleeing from the police or from operating a motor vehicle at high speeds. And in none of these cases did the insureds contemplate that injury or death would result from their course of conduct.
On the basis of the Henkel and Sanders cases, there can be no doubt that the insured, Jeffrey Johnson, died as a result of injuries sustained through "accidental means."
The defendant claims that it is not liable to pay the additional benefits because the insured died while committing an assault upon someone. The defendant had the burden of proving the exception.O'Brien v. John Hancock Mutual Life Ins. Co.,
supra. The defendant offered no proof as to what constituted the assault or upon whom it was allegedly committed, and therefore failed to sustain its burden of proof.
 The court can only conclude that death occurred as a result of injuries sustained through accidental means. On the basis of the facts and the law, the court must render judgment for the plaintiff.
Judgment may enter for $3770, plus interest on same from September 5, 1964, less $123.30, together with taxable costs.